**In the Matter of Charles A. STEEN, Debtor.**

**Dick DIMOND, Trustee, Appellees,**

v.

**UNITED STATES of America, Appellant.**

**No. 73–3099.**

United States Court of Appeals, Ninth Circuit.

Jan. 13, 1975.

Louis A. Bradbury (argued), Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Aaron Holman (argued), New York City, for appellees.

Before KOELSCH, CARTER and CHOY, Circuit Judges.

## OPINION

KOELSCH, Circuit Judge:

The United States appeals from the judgment of the district court adjudicating the government's claim for federal income tax deficiencies against taxpayer Steen, the debtor in a Chapter XII bankruptcy proceeding, and his trustee in bankruptcy. The case came before the district court on the parties' cross-petitions for review of a decision of the referee in bankruptcy. Our jurisdiction rests on 28 U.S.C. § 1291.

The principal question presented is whether the sum of $458,532.03 which Steen received in 1966 is properly treatable as recovery of basis and capital gain, or simply as ordinary income. However, as will become apparent, the answer serves to raise an additional question that will require further proceedings.

The relevant facts are these: In 1952, Steen made an extraordinarily rich uranium discovery in Utah. He subsequently transferred this claim, known as Mi

Vida, and others to Utex Exploration Company (Utex), a Utah corporation, in exchange for shares of Utex stock. Utex and others then formed a corporation known as Uranium Reduction Company (URC) to process uranium ore.

In 1962, Atlas Corporation (Atlas), which like Utex owned a substantial portion of the outstanding URC stock, entered into negotiations with Utex and its shareholders to acquire the Utex holdings of URC stock and Mi Vida. Atlas had no interest in other Utex assets, but it did want the Utex management personnel to continue because of their proven ability to operate Mi Vida.

The parties ultimately entered into two written contracts. Both were executed and dated May 29, 1962. By the terms of one—the Stock Purchase Agreement—Steen and all the other Utex shareholders agreed to sell to Atlas 85 per cent of their respective Utex shares and to transfer the remaining 15 per cent to Utex in exchange for all assets of the latter except Mi Vida and Utex' stock in URC. The specified purchase price was $12,980,000, of which $3,890,000 (or 29.9 per cent) was payable upon closing, with the remainder in installments over the period from August, 1962, through December, 1966. The installment payments were to be secured by a first mortgage on Mi Vida.

By the terms of the second contract— the Mining Agreement—Steen and the other Utex shareholders[1] (the Mining Contractors) agreed to mine Mi Vida for Atlas until December 31, 1966, by which date the parties anticipated the mine would be completely exhausted. The Mining Agreement contained a provision for certain state taxes, the effect of which was to require Atlas to pay the Mining Contractors any difference between $827,000, the anticipated sum of those state taxes, and the amount Atlas would actually pay out for that purpose.

At the time the two agreements were executed, some doubt existed in the Utah mining industry as to whether the Utah tax on mines was properly a personal obligation of a mine's owner, or simply a lien against his mine property. The issue was put to rest several years later by the Supreme Court of Utah, which held that the tax was not a personal obligation. See San Juan County v. Jen, Inc., 16 Utah 2d 394, 401, 952 (1965); Atlas Corporation v. State Tax Commission, 18 Utah 2d 57, 415 P.2d 208 (1966). By the time of the latter decision, Mi Vida was fully exploited and worthless. And because Atlas had no reason to keep Mi Vida and because its actual tax payouts were less by approximately $500,000 than the anticipated $827,000, it paid this difference in 1966 to the Mining Contractors, as provided in the tax provision in the Mining Agreement. Steen's share amounted to $458,-532.03. It is that payment which forms the basis for this controversy.

Steen elected in his 1962 income tax return to report his share of the sales price provided in the Stock Purchase Agreement, i.e., $10,666,023.85 on the installment method pursuant to Int.Rev. Code of 1954, § 453, 26 U.S.C. § 453; he made no mention of any further sum which he might receive under the tax provision in the Mining Agreement. However, in his 1966 return, Steen reported the tax contingency payment ($445,941.85—the $458,532.03 payment less a basis of $12,590.18) as additional capital gain from the Utex stock sale.

The Commissioner, however, took the position that the sum was not capital gain. Pointing to the fact that there were two agreements—the Stock Purchase Agreement which dealt with assets and specified a fixed price for the same, and the Mining Agreement which dealt with services and contained the provision under which the payment under consideration was made—he argued that the payment was not for capital assets but reflected solely compensation for services, and that the Stock Purchase Agreement constituted a "closed transaction";

1. First Security Bank of Utah, N.A., as trustee under a trust for the benefit of four minor children of taxpayer, was one of the "sellers" in the Stock Purchase Agreement but was not a party to the Mining Agreement.

that is, one where the purchase price is either specified or can be ascertained with reasonable certainty.

Steen, on the other hand, contended that the two agreements were part of a single transaction and should be read together; that properly construed, the tax contingency provision related to capital assets and constituted part of the consideration for their purchase. He now adds that because the tax contingency possessed no ascertainable fair market value when the agreements were executed, he is entitled, despite his declaration of a fixed consideration in his 1962 return, to treat the sale as "open" because the installment method of reporting it was substantively unavailable to him in 1962, *see* Gralapp v. United States, 319 F.Supp. 265 (D.Kan.1970), aff'd, 458 F.2d 1158 (10th Cir. 1972),[2] and under our holding in Mamula v. Commissioner, 346 F.2d 1016 (9th Cir. 1965), he is not bound by his impermissible election.

The referee and district court agreed with Steen. They determined that the two agreements integrated a single

transaction; that they should read together; that the tax contingency payment constituted part of the purchase price for capital assets as distinguished from compensation for services; and that the payment was not taxable until received in 1966.

With respect to the issue concerning integration of the two agreements and the allocation of the monies paid under the tax clause, the finding was:

"The $458,532.03 that was paid by Atlas to Debtor [Steen] in 1966 represented his share of an allowance that had been granted conditionally to Atlas in 1962 in fixing the sales price of his Utex shares, and on recovery thereof by Debtor this sum constituted an addition to the sales price of the said shares."[3]

██ We cannot say that this factual determination was "clearly erroneous." Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Chism's Estate v. Commissioner, 322 F.2d 956 (9th Cir. 1965); Cohn v. Commissioner, 226 F.2d 22 (9th Cir. 1955).[4]

---

2. In *Gralapp*, the Tenth Circuit held impermissible a taxpayer's election to report on the installment method sale proceeds received on a contract having an "open ended" selling price, unless the fair market value of the contingency is *de minimis*, because "it [is] impossible to determine the total contract price [at the time of the election] and therefore impossible to calculate the ratable portion of each payment which represent[s] gain under installment payments." 458 F.2d at 1160. For elaboration of the implicit requirement of § 453 that the total contract price be known, *see* Emory, The Installment Method of Reporting Income: Its Election, Use, and Effect, 53 Cornell L.Rev. 181, 195–196 (1968).

We concur in the Tenth Circuit's rejection of the proposition that a taxpayer has "an absolute right to the privilege of installment reporting simply based on the fact that less than 30% of the minimum selling price is received during the first year and which must remain less than 30% if the open end contingency materializes." 458 F.2d at 1160. Were a truly "open" transaction permitted installment treatment under § 453, a substantial and unreasonable administrative burden of frequent recomputations of tax liabilities for past years would thereby be imposed on the Commissioner.

3. On this finding, both the referee in bankruptcy and the district court concluded:

"Debtor [taxpayer] realized long term capital gain on the sum of $458,532.03 received by him in 1966 from the Atlas Corporation."

4. On appeal the government argues that, since taxpayer treated the sale of stock as having a $12,980,000 "total contract price" for purposes of his § 453 computations and since he made no reference in his 1962 return to the possibility of his receiving contingent additional consideration in subsequent years, he is estopped from contending that the right to the contingency payment was part of the consideration for the sale of stock. As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction. Maletis v. United States, 200 F.2d 97, 98 (9th Cir. 1952), cert. denied, 345 U.S. 924, 73 S.Ct. 782, 97 L.Ed. 1356 (1953). *See also* Brown v. United States, 427 F.2d 57, 62 (9th Cir. 1970); Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 659 n. 9 (5th Cir. 1968); Morse v. United States, 265 F.2d 788, 797 (9th Cir. 1959). The rule exists because to permit a taxpayer at will to challenge his own forms in favor of what he subsequently asserts to be true "substance" would encourage post-transactional tax-plan-

While it is true that neither document refers specifically to the other, neither proclaims itself to be a complete integration of the agreement between the parties. Given the size of the transaction, the related subject matter of the two documents, the fact that they were contemporaneously negotiated, drafted, executed and delivered, and the substantial certainty that neither would have been executed without the other, it is apparent that they integrate a single large transaction. Where two or more written agreements are contemporaneously executed as part of one complete transaction, we have labeled "elemental" the proposition that they must be construed together. Parker v. Commissioner, 166 F.2d 364, 367 (9th Cir. 1948). *See, e.g.,* Kurz v. United States, 156 F.Supp. 99, 104 (S.D.N.Y.1957), aff'd, 254 F.2d 811, 812 (2d Cir. 1958); Bullfrog Marina, Inc. v. Lentz, 28 Utah 2d 261, 501 P.2d 266, 270–271 (1972); 4 Williston on Contracts, § 628 at 904 (3d ed. 1961).[5]

Further, the conclusion may be fairly drawn that the tax contingency provision reflects part of the purchase price for assets. Depending upon the taxes paid, the value of those assets and the amount to be paid to the vendors was correspondingly increased or diminished.[6]

We are also clear that—as the Commissioner appears to concede in brief—the contingency payment had no ascertainable fair market value in 1962. This case appears to present one of those rare and extraordinary situations where such a conclusion is permissible,[7] for the right to the payment depends entirely upon a favorable judicial decision on a novel question of state law; in short, we regard payment *vel non* as "wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." Burnet v. Logan, 283 U.S. 404, 413, 51 S.Ct. 550, 552, 75 L.Ed. 1143 (1931); Westover v. Smith, 173 F.2d 90, 91–92 (9th Cir. 1949).[8] Hence the

ning and unwarranted litigation on the part of many taxpayers and raise a monumental administrative burden and substantial problems of proof on the part of the government. In a case such as this one, where the documentary form of the transaction is ambiguous, the government's assertion of the rule will normally render the taxpayer's factual characterization of the transaction on his income tax return conclusive as against his conflicting and subjective testimony. But here the government failed properly to raise the argument below, and, where such an argument is not properly before the trier of fact, we ordinarily may not consider it. Helvering v. Salvage, 297 U.S. 106, 109, 56 S.Ct. 375, 80 L.Ed. 511 (1936); Commissioner v. Callner, 287 F.2d 642, 645 (7th Cir. 1961); Gaylord v. Commissioner, 153 F.2d 408, 416 (9th Cir. 1946).

5. Moreover, parol and other extrinsic evidence would presumably also be admissible to show that the true consideration for the sale of stock was other than that stated in the Stock Purchase Agreement. In Haverty Realty & Investment Co., 3 T.C. 161, 167 (1944), the Tax Court said:

"'* * * the recitals of a written instrument as to the consideration received are not conclusive, and it is always competent to inquire into the consideration and show by parol or other extrinsic evidence what the real consideration was.' Deutser v. Marlboro Shirt Co., (C.C.A., 4th Cir.), 81 Fed. (2d) 139, 142, citing many authorities."

*Cf.* Producers Livestock Loan Co. v. Idaho Livestock Auction, 230 F.2d 892, 894–895 (9th Cir. 1956).

6. The government's argument that the contingency payment reflects compensation because one of the sellers of the stock, the bank (*see* note 1, *supra*), was not a party to the Mining Agreement and hence had no right to a share of the payment is unpersuasive, for the bank received treatment different from that accorded the other sellers in the Stock Purchase Agreement as well; in that latter document, the bank was not required to make personal guaranties as were the other sellers.

7. *See* Treas.Reg. § 1.1001–1(a) (1957); Treas. Reg. § 1.453–6(a)(2) (1958); and Rev.Rul. 58–402, 1958–2 Cum.Bull. 15. *See, e.g.,* Clodfelter v. Commissioner, 426 F.2d 1391, 1395 (9th Cir. 1970), and cases cited therein; McCormac v. United States, 424 F.2d 607, 619, 191 Ct.Cl. 483 (1970); Slater v. Commissioner, 356 F.2d 668, 670 (10th Cir. 1966); Marsack's Estate v. Commissioner, 288 F.2d 533, 535–536 (7th Cir. 1961); Chamberlin v. Commissioner, 286 F.2d 850, 852 (7th Cir. 1960).

8. Moreover, in view of the potential size of the contingency payment, we cannot say that the value of the right to the contingency was by any means *de minimis* as an element of actual sales price in 1962. *Gralapp, supra,* 458 F.2d at 1160; *cf.* Northern v. Nelson, 448 F.2d 1266, 1267 (9th Cir. 1971).

sale of stock was as taxpayer contends, an "open" transaction, and, under *Gralapp* and *Mamula*, taxpayer's election of the installment method of reporting that transaction was impermissible and will not be binding upon him. It necessarily follows that taxpayer's gain realized by reason of the contingency payment, being "gain from the sale or exchange of a capital asset," is taxable as capital gain in the year of its receipt. *Westover, supra*, 173 F.2d at 92; Commissioner v. Carter, 170 F.2d 911, 912–913 (2d Cir. 1948).

■■■ Taxpayer nevertheless misconceives the full import of his disqualification from installment reporting under § 453. By that section, Congress provided an exception to the general rule that the gain realized on the sale or other disposition of an asset is recognized in the year of sale. The statute "was enacted, as shown by its history, to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price." Commissioner v. South Texas Lumber Co., 333 U.S. 496, 503, 68 S.Ct. 695, 700, 92 L.Ed. 831 (1948); *cf.* Tombari v. Commissioner, 299 F.2d 889, 891 (9th Cir. 1962).

■■■ But where, as here, § 453 is substantively unavailable to a taxpayer, the established realization and recognition principles under Int.Rev.Code of 1954, §§ 1001 and 1002, 26 U.S.C. §§ 1001 and 1002, are controlling. Under § 1001, "the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Under § 1002, "[e]xcept as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized."

■■■ Taxpayer's contention that the discounted value of the installment payments is not treatable as "property (other than money) received" in the year of sale because those obligations, like the right to the contingency payment, had no ascertainable fair market value in 1962, is unsound. Atlas was solvent, and it appears likely the payments could and would be made as specified; moreover, payment was secured by a first mortgage on the mine property itself. There can be no doubt that the fair market value of these obligations was susceptible of ascertainment in 1962.[9] *See* Heller Trust v. Commissioner, 382 F.2d 675, 680–681 (9th Cir. 1967); Phillips v. Frank, 295 F.2d 629, 631–633 (9th Cir. 1961), and cases cited therein, *Cf.* United States v. Granello, 365 F.2d 990, 993 (2d Cir. 1966); Cowden v. Commissioner, 289 F.2d 20 (5th Cir. 1961).

■■■ Steen makes a further argument that once a transaction is deemed "open," nothing which is to be paid thereunder is subject to recognition until it is actually paid. Again we disagree. Where a transaction is "open" because a part of the consideration has no ascertainable fair market value in the year of sale, any part having an ascertainable value is nevertheless taxable in that year. *See* Commissioner v. Carter, 170 F.2d 911 (2d Cir. 1948);[10] *cf.* Gersten v. Commissioner, 267 F.2d 195, 198 (9th Cir. 1959).[11] In other words, taxation of an

---

9. While the amount of the fair market value of property is a question of fact, whether value is ascertainable is reviewable question of law. *See* Rev.Rul. 58–402, 1958–2 Cum. Bull. 15, 16, and cases cited therein. Clodfelter v. Commissioner, 426 F.2d 1391, 1395 (9th Cir. 1970), is not to the contrary, for in that case we merely upheld a finding of the Tax Court as to the value of deferred installments.

10. In *Carter,* the taxpayer "received property having a fair market value exceeding by about $20,000 the cost basis of her stock, and she reported such excess as a capital gain in her 1942 [year of liquidation] return and paid the tax thereon." 170 F.2d at 911.

11. Taxpayer derives no help from Int.Rev. Code of 1954, § 1001(d), 26 U.S.C. § 1001(d), which provides:

"(d) Installment Sales.—Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received."

"open" transaction is deferred only to the extent that consideration received by the seller consists of property having no ascertainable fair market value in the year of sale and then only because "the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty [is] . . . in no proper sense equivalent to cash." Burnet v. Logan, *supra*, 283 U.S. at 413, 51 S.Ct. at 552. Were the rule otherwise, a taxpayer could defer taxation on a substantial portion of the consideration involved in a large sale not qualifying under § 453 for "the special treatment reserved for what the Congress thought to be the more clearcut hardship cases," see *Tombari, supra*, 299 F.2d at 891, by simply taking a relatively small portion of the consideration in the form of a highly contingent right to funds.

We hold that the two contracts of 1962 must be construed together and that the payment of $458,532.03 in 1966 was a capital gain received and reportable in 1966; that the transaction was an "open" and not a "closed" transaction and that the taxpayer may not claim the installment reporting method under 26 U.S.C. § 453, but his reporting must be made under 26 U.S.C. §§ 1001 and 1002. We hold further that the discounted value of the installments paid after 1962 should be ascertained as of 1962 and findings of fact on such value should be made by the referee, with the result that all the value of the downpayment in 1962 and the discounted installment payments received thereafter (except the contingency payment in 1966) be reported as capital gain in 1962.

In the instant case, the government presented evidence as to the 1962 discounted value of the installment obligations, but neither the referee in bankruptcy nor the district court made a finding of fact as to value. Accordingly, the case must be remanded for further findings, based on the evidence in the record and such additional evidence as the court may deem appropriate, and for recomputation of taxpayer's liabilities for 1962 and subsequent tax years.

Vacated and remanded for further proceedings in accordance with the views expressed herein.

As the Supreme Court observed in Commissioner v. South Texas Lumber Co., *supra*, 333 U.S. at 506, 68 S.Ct. at 701:

"[t]his [section] means that where a taxpayer has validly reported its income from installment sales on the installment basis provided by § 44 [presently § 453], that section, not §§ 111, 112, and 113 [presently §§ 1001, 1002, 1011, and 1012], prescribes the extent to which receipts from such sales are 'recognized' as taxable and the year in which such receipts are 'recognized' in computing taxable income."