GULF OIL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22499-82.        Filed May 7, 1986.

*J. Waddy Bullion, Emily A. Parker, Sean T. Crimmins, Buford P. Berry, J. Y. Robb III,* and *Margaret S. Alford,* for the petitioner.

*Raymond L. Collins* and *William B. Lowrance,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable year 1974 in the amount of $80,813,428 and for the taxable year 1975 in the amount of $166,316,320. Petitioner and respondent, by motion granted on November 10, 1983, agreed that certain issues would be severed and tried at a special trial session, which was held at Dallas, Texas.

One of the group of issues tried was designated by the parties as the "Kuwait Nationalization." This requires the resolution of three issues: (1) Whether the value of the discount to be received under the crude oil supply agreement entered into on December 1, 1975, and formally executed on March 24, 1976, between Gulf Kuwait Co. and the Government of Kuwait, constituted compensation for the nationalization of Gulf Kuwait's assets and interest in the Kuwait Concession; (2) whether the value of the discount could be ascertained with reasonable accuracy in the taxable year 1975; and (3) whether the income taxes payable by Gulf Kuwait pursuant to the crude oil supply agreement are creditable taxes under section 901(f),[1] which are subject to accrual in the taxable year 1975.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of facts and accompanying exhibits are so found and incorporated by this reference.

Gulf Oil Corp. (hereinafter referred to as petitioner or Gulf) is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal office in Pittsburgh, Pennsylvania. During the taxable years at issue, Gulf and certain of its subsidiary corporations constituted an "affiliated group" as that term is defined in section 1504. Petitioner, directly and through its foreign subsidiaries and affiliates, is engaged in world-wide exploration, development, production, purchase, and transportation of crude oil and natural gas and in the manufacture, transportation, and marketing of petroleum products. During the taxable year 1975, Gulf Kuwait Co. (hereinafter referred to as Gulf Kuwait) was a wholly owned Delaware subsidiary of Gulf Exploration Co. Gulf Exploration Co. was a wholly owned Delaware subsidiary of Transocean, and Transocean was a wholly owned Delaware subsidiary of Gulf. Gulf Exploration Co. was liquidated by merger into Transocean on December 31, 1975.

Petitioner maintained its books of account for the taxable years in issue on the accrual method of accounting using the calendar year as its taxable year. Gulf, as the common parent of an affiliated group of corporations, timely filed consolidated Federal income tax returns for its taxable year 1975 on behalf of itself, and certain of its subsidiary corporations, with the Office of the Internal Revenue Service at Pittsburgh, Pennsylvania. On its consolidated Federal income tax return for the taxable year 1975, petitioner reported capital gain in the amount of $276,517,903, pursuant to section 1231, with respect to the nationalization of its remaining interests in the Kuwait Concession and related assets. Petitioner also reported a foreign tax credit, after application of the section 907 limitation, for income taxes in the amount of $293,892,381[2] paid or accrued to Kuwait.

---

[2]Kuwaiti taxes that were reported by petitioner as either paid or accrued during the taxable year 1975 prior to the application of the sec. 907 limitation totaled $315,674,245.

Petitioner initially obtained rights to operate in Kuwait in 1934. Petitioner obtained rights in the Kuwait Concession (hereinafter referred to as the Kuwait Concession or the Concession) by an agreement dated December 30, 1951, among His Highness Shaikh Abdulla As-Salim Al-Sabah, D'Arcy Kuwait Co., Ltd., and Gulf Kuwait, which agreement (hereinafter referred to as the 1951 Concession Agreement) granted one-half of the rights in the Kuwait Concession to Gulf Kuwait and one-half to BP Kuwait Ltd. (hereinafter referred to as BP Kuwait), a subsidiary of the British Petroleum Co. Ltd. (hereinafter referred to as BP). Kuwait Oil Co. Ltd., a United Kingdom corporation formed on November 6, 1951, was owned 50 percent by Gulf Kuwait and 50 percent by BP Kuwait. Under the 1951 Concession Agreement, Gulf Kuwait and BP Kuwait appointed Kuwait Oil Co. Ltd. as their manager to manage and carry on the operations in the Kuwait Concession.

Petitioner's interest in the Kuwait Concession was one of its most valuable assets in the Middle East from the time of the grant until the nationalization of the Kuwait Concession was completed in 1975. Prior to 1973, petitioner averaged production of approximately 2.8 to 3 million barrels of crude oil per day from its interest in the Kuwait Concession. The main Burgan Field, a very large proven reserve of oil, is one of the finest reservoirs in the world. As a result of its interest in this oil, petitioner established customers and constructed downstream facilities dependent on Kuwaiti crude oil. The Kuwait Concession, as established by the 1951 Concession Agreement and confirmed by later agreements, ran to the year 2026.

As a result of the formation of OPEC,[3] the Yom Kippur War, and the Arab Boycott in late 1973, the flow of oil from the Middle East was disrupted and the price of oil increased dramatically. During this period of instability, the oil producing governments began to exert pressure for further increases in their participation in the oil concessions, usually by nationalization. The stated policy of OPEC that

---

[3]OPEC is the acronym for the Organization of Petroleum Exporting Countries, formed in approximately 1972, the five charter members of which were Iraq, Iran, Kuwait, Saudi Arabia, and Venezuela. The membership of OPEC expanded during the taxable years at issue, but continued to include Kuwait for all relevant periods. OPEC's power was manifested by its demonstrated ability to raise prices, raise royalties, and raise taxes.

all members were to abide by was that members should pay no more than book value for physical assets, and that no amounts should be paid to the oil companies for the value of the minerals in place.

By agreement dated January 8, 1973, between the Government of Kuwait, BP, BP Kuwait, Gulf, and Gulf Kuwait (hereinafter referred to as the 1973 General Agreement), Kuwait acquired 25 percent of Gulf Kuwait's interest in the Kuwait Concession and related assets in Kuwait and the option to acquire an additional 26 percent of the Kuwait Concession and related assets by 1982. The 1973 General Agreement contemplated a series of 5-percent increases in the Kuwaiti Government's ownership of the Kuwait Concession until it achieved a 50-percent interest in the year 1982. The 1973 General Agreement was not the result of protracted negotiation, but was an imposed agreement designed to insure that Kuwait would receive the same degree of participation in the revenues from its oil fields as other countries had negotiated with respect to theirs. Consideration for the initial 25-percent participation by Kuwait in the revenue flow from the Concession was a payment equal to the book value of the physical assets. No portion of the payment was allocated to the value of the minerals in place.

Agreements such as the 1973 General Agreement were further proof to the oil producing governments that they could demand and get increased ownership of the physical assets and oil fields. Pursuant to an agreement dated January 29, 1974, between the Government of Kuwait, BP Kuwait, and Gulf Kuwait (hereinafter referred to as the 1974 Concession Agreement), Kuwait increased its ownership to 60 percent of the Concession. As the sole consideration for this acquisition by the Kuwaiti Government, Gulf Kuwait received a cash payment in the amount of $66 million representing the book value of a proportionate part of the physical assets related to the Concession and located in Kuwait. This payment, as under the 1973 Concession Agreement, was computed with reference to the OPEC formula for compensation.

Kuwait Oil Co. (K.S.C.), a Kuwaiti corporation, was formed pursuant to Article 5(ii) of the 1974 Concession Agreement. The voting stock of this corporation reflected

the ownership interests in the Kuwait Concession after the 1974 Concession Agreement and was owned 60 percent by the Government of Kuwait, 20 percent by BP Kuwait, and 20 percent by Gulf Kuwait. The 1974 Concession Agreement provided that the relationship between Kuwait, Gulf Kuwait, and BP Kuwait should be reviewed prior to the end of 1979.

During the taxable years in issue, Kuwait had a government which consisted of an elected National Assembly and a monarchy, as well as a free press. In January of 1975, the Kuwaiti Government elected a new Council of Ministers that included, for the first time, a Minister of Oil. Control over oil policy previously had been vested in the Minister of Finance. The new Minister of Oil, who had studied in the United States and was a graduate of Cairo University, was a prominent member of the National Assembly. On March 5, 1975, the Minister of Oil announced the intention of the Kuwaiti Government to nationalize the remaining 40-percent equity of the two oil companies. Because petitioner and BP (through Gulf Kuwait and BP Kuwait) were the only concession holders for the onshore Kuwait area, no other oil companies were involved in the 1975 nationalization.

M.L. Ralston (hereinafter referred to as Ralston) was the primary negotiator for petitioner in all subsequent negotiations with the Kuwaiti Government. Ralston has been employed by petitioner since 1947. From 1962 through 1967, he was assigned to Kuwait Oil Co. Ltd. in the capacity of assistant general superintendent to the Kuwait refinery. He later served as managing director of Kuwait Oil Co. Ltd. from 1969 through 1972. After being transferred to London in 1972, Ralston maintained a continuing interest in Kuwaiti affairs as the executive vice president of Gulf Eastern Hemisphere. Ralston had executed the 1973 General Agreement on behalf of petitioner.

On March 29, 1975, Ralston and a representative of BP met with the Prime Minister of Kuwait whom they had known for many years and who formerly had been responsible for oil policy in Kuwait. At this meeting, the Prime Minister assured Ralston that the Kuwaiti Government did not intend to force the oil companies out of Kuwait. The

Prime Minister indicated that the Kuwaiti Government needed the companies and respected their contributions to Kuwait. Petitioner attributed great significance to the Prime Minister's words since they indicated that a negotiated settlement between the Kuwaiti Government and the companies was possible.

Gulf and BP marketed the majority of the oil produced from Kuwait before the nationalization process was completed in 1975. These services were important to Kuwait. During the course of negotiations, however, the Kuwaiti Government advised petitioner that it had alternative sources (including Royal Dutch Shell and certain French companies) for providing technical services after the nationalization. Petitioner was also aware that many U.S. and European entities could and would like to perform such services for the Kuwaiti Government.

After the initial meetings in late March, negotiations between the Kuwaiti Government, petitioner, and BP continued in an attempt to conclude a negotiated settlement that was acceptable to all parties. The initial, as well as the final, position of the Kuwaiti Government was that the only consideration that would be paid to Gulf Kuwait and to BP Kuwait for the nationalization was the amount of $25,250,000 each for the net book value of the physical assets, in accord with the OPEC formula, and that no other compensation would be paid. In negotiating the nationalization settlement with the Kuwaiti Government, petitioner took the position that Gulf Kuwait must be compensated on the basis of an overall package providing not only cash consideration for its physical assets, but also an adequate economic benefit representing the loss of anticipated profits from its interest in the Kuwait Concession. Petitioner felt that adequate compensation could be achieved through such means as discounts on future oil purchases, service fees, extended credit terms on future oil purchases, or any combination of these elements. Gulf was unwilling to voluntarily relinquish its rights in the Kuwait Concession for compensation limited solely to payment for the book value of the physical assets.

Pursuant to an agreement between the Government of Kuwait, BP Kuwait, and Gulf Kuwait, dated December 1,

1975 (the Nationalization Agreement), Kuwait acquired the remaining interest of Gulf Kuwait in the Kuwait Concession and related assets as of March 5, 1975. As a result of this agreement, Gulf Kuwait relinquished its interest in the Kuwait Concession and related assets to the Kuwaiti Government, effective March 5, 1975. Petitioner did not claim an economic interest in Kuwait after March 5, 1975. The Nationalization Agreement specified that Gulf Kuwait and BP Kuwait would each be paid $25,250,000. This was the same amount that had been consistently presented by Kuwait as equivalent to book value of the physical assets.

The Nationalization Agreement was to become effective upon the date of its ratification in accordance with the Constitution of Kuwait. Petitioner was confident that the agreement would be ratified by the National Assembly of Kuwait and signed by the Head of State. The negotiations leading up to the agreement had been conducted in good faith by both sides. Further, petitioner knew that the agreement had already been approved by the Council of Ministers, which would not have given its approval unless it felt certain that the agreement would be ratified. Since the negotiations had been conducted publicly, the reputation of the Kuwaiti Government was very much at stake in gaining approval of the Nationalization Agreement. Petitioner had also received assurances from the Prime Minister of Kuwait that the agreement would be ratified. Finally, all of the sources monitored by Ralston during his months of negotiating in Kuwait indicated that the Nationalization Agreement would be ratified. Not only was ratification of the Nationalization Agreement by the Kuwaiti National Assembly required by the Constitution of Kuwait, but also, petitioner was unwilling to relinquish its interest in the Kuwait Concession pursuant to that agreement without the National Assembly's approval of the terms. The Nationalization Agreement was ratified by the Kuwaiti National Assembly on March 18, 1976.

Additional agreements (including the crude oil supply agreement) were executed contemporaneously with the Nationalization Agreement on December 1, 1975, but were not subject to ratification by the National Assembly of Ku-

wait.[4] The items covered by the agreements were within the jurisdiction of either the Minister of Oil or the Minister of Finance, and many involved technical issues that some members of the National Assembly were not expected to understand. Although Gulf would have preferred either that these agreed items be included in a single comprehensive document subject to approval by the National Assembly, or that the Nationalization Agreement and additional agreement explicitly cross-reference each other, Kuwait was unwilling to agree to either suggestion. None of the documents executed by Kuwait, BP Kuwait, and Gulf Kuwait on December 1, 1975, included any indication that the commercial arrangements in the additional agreements were intended by Kuwait as compensation for the nationalization of the Kuwait Concession. The Government of Kuwait never agreed publicly or privately nor did any document by the Kuwaiti Government state that any compensation was paid for the relinquishment by petitioner of its rights in the Kuwait Concession other than the payment for the physical assets specified by the OPEC formula.

There were six items covered by the primary additional agreement. The first, and most detailed, was the crude oil supply agreement. Gulf agreed to purchase 650,000 barrels per day of Kuwaiti crude oil from April 1 to December 31, 1975, and 500,000 barrels per day of Kuwaiti crude oil from January 1, 1976, to March 31, 1980. The price established by the agreement was the f.o.b. price per barrel established by the Kuwaiti Government for sale to general purchasers less "a sum which after the deduction of Kuwait Income Tax payable with respect thereto shall be 15 U.S. cents per barrel." Gulf was required to resell the purchased oil in Kuwait at the pre-discounted price. Terms of payment and an agreement for consultation on an extension for 5 years of purchases by Gulf at the rate of 400,000 barrels per day were also specified. Although the crude oil supply agreement anticipated that a binding contract with more precise

---

[4]Additional agreements included a settlement of claims including Kuwaiti income tax liability of petitioner; a transfer of the assets, liabilities, and existing contracts for services and employment of personnel from Kuwait Oil Co. Ltd., to Kuwait Oil Co. (K.S.C.); an aide memoir which included various mechanisms for notification procedures and price and quantity adjustments; and an agreement for the payment of interest from Gulf Kuwait to Kuwait.

terms would be executed within a short period of time, the additional agreement specified that the above terms would be treated as a binding contract until the formal contract was executed.

The remaining five items in the primary additional agreement were as follows: (1) Gulf and Kuwait were to enter into discussions concerning commercial sales of petroleum products; (2) Gulf agreed to purchase bunker fuel (a heavy residual fuel used by ships, industry, and for large-scale heating installations) during the term of the crude oil supply agreement in a volume equivalent to 1.5 percent by weight of the quantity of crude oil purchased by Gulf; (3) Gulf was to charter three tanker vessels from Kuwait for so long as the crude oil supply agreement and subsequent contract were in effect; (4) Gulf was to provide suitable qualified personnel to support the operations of Kuwait Oil Co. (K.S.C.) and any other governmental entity engaged in oil operations in Kuwait;[5] and (5) Gulf and Kuwait agreed, in principle, to seek joint commercial investment opportunities, including but not limited to hydrocarbon related investments with particular emphasis on opportunities arising within Arab countries. Gulf felt that these five items were commercial arrangements that provided it with adequate compensation. These five items were described in no more than one paragraph each, with provision for the execution of commercial arrangements and formal contracts at a later, unspecified date.

At the time that the crude oil supply agreement was executed on December 1, 1975, petitioner had the full expectation that the formal crude oil supply contract contemplated by the agreement would be entered into because basic discussions for the formal contract already had started and crude oil continued to be produced by Gulf Kuwait without interruption. Petitioner had no doubt that it would receive the full value of the proposed discount despite the instability in the oil market.

The formal crude oil supply contract anticipated by the crude oil supply agreement was executed on March 24,

---

[5] An agreement entitled Secondment of Personnel and Agreement for Technical Support Services was executed in accord with the additional agreement on Jan. 17, 1976, effective Jan. 1, 1976. The parties to this agreement were Kuwait Oil Co. (K.S.C.) and Geoman, Ltd. The latter was acting on behalf of Gulf Kuwait.

1976. Its terms were in accord with those specified in the additional agreement. Gulf and Kuwait abided by the terms of the crude oil supply agreement and subsequent contract. During the period from March 5, 1975, through March 31, 1980, the crude oil purchased by Gulf Kuwait pursuant to the crude oil supply agreement was resold by it to Transocean at the contract price before application of the discount. Transocean in turn resold such crude oil to petitioner's wholly owned subsidiaries in Europe, to affiliates, and to unrelated third parties, principally in the Far East. The average price of the Kuwaiti crude oil sold by Transocean was not less than the "official selling price," which may have been equivalent to the pre-discount price specified in the crude oil supply agreement.

Although petitioner wanted compensation in excess of the payment for book value of the physical assets expressed in the agreements, it nevertheless was pleased with the final negotiated package, which included a strong commercial relationship with the Government of Kuwait. After the nationalization, Gulf and Kuwait agreed to continuing utilization by Kuwait of downstream facilities, the provision of marketing facilities and technical personnel, the purchase of bunker oil, the lease of tankers, but most importantly from petitioner's point of view, the continuation of a crude oil supply at an advantageous price. The Kuwaiti Government consistently referred to all of the agreements other than the Nationalization Agreement as commercial arrangements and not as compensation for the nationalization of the Kuwait Concession. Kuwait's consistent public and private position was that the only compensation for the Concession was the payment for the net book value of the assets and that the discount was given because Gulf was such a large purchaser of Kuwaiti crude. Gulf's execution of the Nationalization Agreement was conditioned upon its conclusion that the value of all of the commercial arrangements plus the amounts paid under the OPEC formula adequately compensated it for its Concession rights. When it valued the compensation received for the nationalization for U.S. income tax purposes, however, Gulf added the discount to be received under the crude oil supply agreement to the payments for the physical assets under the

OPEC formula, and disregarded the consideration to be paid for any of the other agreed items. Gulf considered the other arrangements to be items of benefit solely to Kuwait, despite the fact that petitioner received adequate value from each of the other items.

Although no other purchaser of large volumes of Kuwaiti oil (other than BP) received a discount during the taxable years relevant to this case, Royal Dutch Shell (Shell) benefited from favorable credit terms during the period in question. Shell had been a substantial purchaser of Kuwaiti crude for many years under a prior contract with petitioner. When that contract came to an end because of the Kuwaiti Government's increasing participation in the Kuwait Concession, Shell established its own direct contract with the Government and was given very beneficial credit terms in recognition of benefits it had previously enjoyed under its contract with petitioner. During the course of the nationalization negotiations, Ralston advised the Kuwaiti Government that Gulf Kuwait would not voluntarily relinquish its 20-percent interest in the Kuwait Concession for consideration in the form of a crude oil discount when another ordinary buyer, Shell, was also receiving the equivalent of a reduced price. Petitioner objected to the favorable credit terms offered to Shell because it devalued the discount being offered to Gulf. After the Nationalization Agreement was executed on December 1, 1975, petitioner was advised that the Shell contract was amended to eliminate the favorable credit terms.

The information used to compute the value of the discount reflected on petitioner's return for the taxable year 1975 was obtained by extrapolation from the Kuwaiti income tax invoices received from the Kuwaiti Minister of Oil for the year 1975, and from the terms set forth in the crude oil supply agreement. The value of the discount to be received under the crude oil supply agreement was computed, for purposes of the return for the taxable year 1975, on the assumption that petitioner would buy oil from Kuwait in volumes averaging 500,000 to 600,000 barrels per day or the maximum volumes available to petitioner from Kuwait pursuant to the agreement. Gulf was required to pay income taxes to Kuwait at a rate of 55 percent on the

difference between the pre-discount price and the post-discount price. The discount was computed algebraically by dividing the stated pre-tax discount (33 1/3 cents) by the reciprocal of the tax rate (45 percent) for an after-tax discount amount of 15 cents per barrel. This amount was then reduced to present value. The discounted value of the discount before Kuwaiti income taxes was determined for the initial 5-year term contemplated by the agreement and did not include any discount that might be received if the agreement were extended beyond March 31, 1980.

On its consolidated Federal income tax return for the taxable year 1975, petitioner reported a total capital gain of $276,517,903 under section 1231 with respect to the nationalization of its concession interest and related assets in Kuwait. Of this amount, $275,399,947 represented the present value of the crude oil discount that was to be received over the term of the crude oil supply contract anticipated by the crude oil supply agreement. The remaining amount, or $1,117,956, represented the difference between the stated cash payment, $25,250,000, received by petitioner for its physical assets located in Kuwait and petitioner's adjusted basis in the assets for tax purposes in the amount of $24,132,044. Petitioner subsequently recomputed the value of the discount under the crude oil supply agreement using the actual number of barrels produced by Gulf Kuwait over the entire term of the agreement from April 1, 1975, through March 31, 1980. Under the revised computation, the present value of the crude oil discount as of the end of the taxable year 1975 was $273,115,619, a figure differing from the figure on petitioner's return by less than 1 percent.

The Commissioner, in his statutory notice of deficiency, determined that the discount under the crude oil supply agreement was not consideration for the nationalization and disallowed the gain under section 1231 in the amount of $276,517,903. He allowed a loss under section 1231 in the amount of $133,638. He determined that petitioner realized ordinary income under the agreement in the amount of $952,469 but gave no explanation for this determination. He determined in the alternative, that, if the discount to be received under the crude oil supply agreement were held to

be part of the nationalization proceeds, that the discount to be received in the future had no ascertainable fair market value in the taxable year 1975 because it was contingent upon future purchases and was nonassignable.

Petitioner, on its return for 1975, claimed a foreign tax credit for foreign income taxes paid or accrued to Kuwait in the amount of $315,674,245, of which $151,469,970 related to such tax accrued on the discount under the oil supply contract which petitioner had included as proceeds from nationalization. The $151,469,970 was computed by multiplying the present value of the discount, $275,399,947, by the Kuwaiti tax rate of 55 percent. The $151,469,970 represents the Kuwaiti income tax that petitioner would be required to pay over the 5-year term of the oil supply contract.

On June 3, 1955, the Internal Revenue Service issued to petitioner a ruling in which it held that Kuwaiti income tax qualified as a creditable tax. That ruling has not been revoked. In the statutory notice of deficiency, the Commissioner allowed the credit for Kuwaiti income tax accrued or paid before the date of nationalization, March 5, 1975, in the amount of $142,748,973.[6] He determined further that the accrued foreign income tax credit for Kuwait from the period March 5, 1975, through the end of 1975 was not allowable as a credit. After section 907(a) adjustments, this determination resulted in a net disallowance of foreign tax credit for income tax paid or accrued to Kuwait in the amount of $220,911,081. The Commissioner allowed $36,209,447 as a deduction for the accrued Kuwaiti income tax, which he determined to represent the taxes accrued to Kuwait from March 5, 1975, through the end of 1975. The disallowance of the credit was based upon the Commissioner's determination that the payments of $315,674,245 did not represent a creditable tax under section 901 except those accrued before March 5, 1975, limited by the provisions of section 907. There is no explanation as to why the net amount of the foreign tax credit disallowed,

[6]The accrued Kuwaiti income taxes for the period between Jan. 1 and Mar. 4, 1975, of $142,748,973 were reduced by a sec. 907(a) adjustment of $47,985,809 for an allowable credit in the amount of $94,763,164. Issues relating to the proper interpretation and application of sec. 907 to the amount of petitioner's creditable foreign taxes were not severed or set for trial.

$220,911,081, cannot be reconciled to the amount allowed as a deduction, $36,209,447.

## OPINION

The issues for decision are: (1) Whether the value of the discount under the crude oil supply agreement entered into on December 1, 1975, between Gulf Kuwait Co. (Gulf Kuwait) and the Kuwaiti Government constituted compensation for the nationalization of Gulf Kuwait's assets and interest in the Kuwait Concession; (2) whether the value of the discount could be ascertained with reasonable accuracy in the taxable year 1975; and (3) whether the Kuwait income taxes payable by Gulf Kuwait pursuant to the crude oil supply agreement are creditable taxes paid or accrued with respect to the proceeds of nationalization.

The determinations of the Commissioner in his statutory notice of deficiency are presumptively correct and petitioner has the burden of disproving each individual adjustment. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Petitioner, therefore, bears the burden of proving that the discount contained in the crude oil supply agreement was compensation for the nationalization of assets, the value of the discount, and the Kuwaiti tax payable with respect to the discount.

The record as a whole makes three facts abundantly clear: Gulf intended to negotiate for as good an overall package from Kuwait as possible in connection with the relinquishment of the Kuwait Concession; Kuwait did not intend at any time to pay any more as compensation for the nationalization of the Kuwait Concession than the amount set under the OPEC formula; and Gulf and Kuwait continued a variety of commercial arrangements, including a crude oil supply agreement, after the nationalization. Petitioner would have us draw the inference from these facts that the compensation received includes not only the amount set forth in the Nationalization Agreement but also the amount of the discount under the crude oil supply agreement. Respondent counters that the plain language of the Nationalization Agreement is that the compensation for the nationalization was limited to the OPEC formula amount. We agree with respondent.

Petitioner's argument for the inclusion of the value of the discount as consideration for nationalization is based upon the following factors: (1) The Nationalization Agreement and the crude oil supply agreement were executed on the same date; (2) the agreements were interrelated; (3) petitioner would not have entered into the Nationalization Agreement without the additional compensation received in the form of the discount; (4) the parties understood that the discount was additional compensation; (5) petitioner treated the discount as compensation for the nationalization on its return for the taxable year 1975; and (6) the substance of the transaction was that petitioner relinquished its interest in the Kuwait Concession pursuant to the Nationalization Agreement in exchange for the discount under the crude oil supply agreement. These factors can be condensed into one basic argument: the Court should disregard both the language of the documents and the lack of evidence that Kuwait agreed to pay compensation beyond the OPEC formula amount because Gulf itself thought of the crude oil supply agreement discount as additional compensation.

This Court has been willing in some instances to look beyond the language of a document to determine the true consideration by means of parol or other extrinsic evidence. *Haverty Realty & Investment Co. v. Commissioner*, 3 T.C. 161, 167 (1944). See also *Estate of Craft v. Commissioner*, 68 T.C. 249 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). Petitioner's position is, however, supported by no more than the statements of petitioner's employees as to the goals that it wished to achieve in the negotiations.

Petitioner cites several cases in support of its proposition that a taxpayer may treat a right created under one contract as a portion of the amount realized on a contemporaneous sales transaction. In *Steinway & Sons v. Commissioner*, 46 T.C. 375 (1966), the taxpayer sold a warehouse for a cash payment plus a contractual right to occupy a portion of the premises rent-free for a specified period. The contract of sale and occupancy agreement, unlike the present case, were expressly interdependent upon each other. The holding of the Tax Court that the value of the right to occupy the premises was a portion of the consideration received for the warehouse is, therefore, unhelpful to

petitioner. A sale and agreement for rent-free occupancy were also expressly interrelated in *Eller v. Commissioner*, 77 T.C. 934 (1981).

The facts in *In re Steen v. United States*, 509 F.2d 1398 (9th Cir. 1975), are more analogous because, although the two agreements at issue were signed contemporaneously, neither document referred to the other. One document was for the purchase of stock of a mining company, while the second document provided that the previous owner of the company would operate the mine for the new owners. The second document also contained a provision for a rebate to the previous owners if the State taxes should be less than anticipated. Such a payment was made and characterized by the previous owner as additional consideration for the stock. As the Ninth Circuit stated:

> While it is true that neither document refers specifically to the other, neither proclaims itself to be a complete integration of the agreement between the parties. Given the size of the transaction, the related subject matter of the two documents, the fact that they were contemporaneously negotiated, drafted, executed and delivered, and the substantial certainty that neither would have been executed without the other, it is apparent that they integrate a single large transaction. Where two or more written agreements are contemporaneously executed as part of one complete transaction, we have labeled "elemental" the proposition that they must be construed together. [509 F.2d at 1403; citations omitted.]

The tax contingency was found to be inextricable from the sale of the stock and negotiated as such by both parties. 509 F.2d at 1402. Furthermore, both parties were presumably in a position to refuse to execute one document without the other, an enviable position that we do not believe petitioner enjoyed during the nationalization process.

In this case, petitioner asks the Court to assume, without either parol or written support, that the Kuwaiti officials were secretly acting in direct contravention of OPEC policy and the Nationalization Agreement presented to the Kuwait National Assembly as the document of nationalization. We find it telling that petitioner has failed to present even one Kuwaiti document or witness in support of its argument nor has any one of its witnesses been able to affirm such an intention on the part of a single Kuwait official. Petitioner has simply not shown any direct linkage between the

nationalization and the receipt of the discount. Although the Nationalization Agreement and the crude oil supply agreement were signed on the same date, the documents serve separate purposes: the former document nationalizes the Kuwait Concession while the latter sets forth guidelines for future commercial arrangements. Although we believe that Gulf would rather not have executed the Nationalization Agreement without receiving the crude oil supply agreement, we have no evidence to support their ability to avoid nationalization if Kuwait had decided to deal with another entity as it had indicated that it might. Gulf argues that we do not need to find that Kuwait intended the discount to be compensation because the characterization for U.S. tax purposes of the discount as a commercial arrangement or as consideration for the Kuwait Concession had no importance to Kuwait. Petitioner argues that bilateral agreement as to characterization is not essential unless the parties would be predisposed to characterize the transaction differently for tax purposes. Although a taxpayer may be entitled to argue substance over form in a transaction (*Ciaio v. Commissioner*, 47 T.C. 447 (1967)), there must be some evidence that the substance of the transaction was in accord with the position argued by petitioner rather than the form set forth by all of the relevant documents. In this case, although we agree that there is no evidence that Kuwait was concerned with the tax consequences of the transaction as to petitioner, we cannot agree that petitioner's attempt to characterize the payments as additional consideration for the Kuwait Concession would be acceptable to Kuwait. As all of petitioner's witnesses admitted, the Kuwait officials consistently took the position that OPEC policy and national politics would not allow them to pay petitioner any more than the amount stated in the Nationalization Agreement.

The objective facts are far more consistent with the official Kuwaiti position than with the characterization urged by petitioner. There is no indication in the record that the compensation to be received for the final 20-percent interest in the Kuwait Concession was computed any differently than under the 1973 General Agreement and the 1974 Concession Agreement, each of which nationalized a

portion of the Kuwait Concession in exchange for payments limited by the OPEC formula. Although we have no doubt that petitioner thought of the discount as additional compensation, it has presented no evidence whatsoever by way of written or oral evidence that the Kuwaiti Government was of the same mind. Both Mr. Ralston and the Chairman of the Board of Gulf, James Lee, confirmed that the Kuwaiti National Assembly would not have ratified the Nationalization Agreement had it included any provisions for consideration beyond the OPEC formula amount.

Further, the documents other than the Nationalization Agreement not only provide no cross-references to the Nationalization Agreement, but also are internally balanced in terms of quid pro quo. Gulf wanted to continue its commercial arrangements with Kuwait because of its investments in downstream facilities and because of the quality of the Kuwaiti crude. Kuwait was interested in continuing to market a large portion of its crude oil through Gulf as well as obtaining technical assistance, contracts for the lease of tankers, and other commercial arrangements. Although Gulf did not place a high value on the commercial arrangements other than the crude oil supply agreement, Kuwait believed that the other benefits to be received by it and the continuation of the past relationship were important and worth the value of the discount to be given to Gulf. When the commercial arrangements are viewed in toto, each of the parties, as conceded by Gulf, received adequate consideration. The arrangements stand on their own despite the fact that they were executed contemporaneously with the Nationalization Agreement.

Finally, although petitioner included the discounts to be received under the crude oil supply agreement in the proceeds of nationalization, it did not include the amounts to be received by it for the service agreement and other commercial arrangements set forth in the same document. Petitioner differentiates the discount from the other items on the following grounds: the terms of the other agreements were not fixed; none of the other agreements were anything more than routine commercial arrangements; and the value of the agreements was of minimal value to Kuwait. As noted above, however, the entire package provided benefits

to both parties and outlined the form of the future relationship between Gulf and Kuwait in light of the contemporaneous nationalization. Kuwait had indicated a desire to preserve as much as possible the cordial and mutually beneficial relationship. The grant of a volume discount was not an unexpected part of that relationship. Shell had been a large volume purchaser but did not hold a concession. Although Shell did not receive a stated discount, it did receive beneficial credit terms in recognition of its past connections with Kuwait. Gulf itself had received a net 21.8 cents per barrel discount for a period of time ending on March 31, 1975, while only a net 15 cents per barrel thereafter. Arrangements such as favorable credit terms or volume discounts are not unusual. The commercial arrangements set forth in the additional agreements are different only in detail and scope.

We find that the value of the discount was not compensation for the nationalization of the Kuwait Concession. We must, therefore, determine whether the value of the discount is income to petitioner in the taxable year 1975. The discount was to be received in the following fashion: Gulf Kuwait bought the oil at a discounted price, and then sold the oil to another of petitioner's subsidiaries, Transocean, at the pre-discounted price. Transocean, in turn, resold the oil at prices equal to or greater than the official selling price, a term which was not specifically defined.

Section 1.446-1(c)(1)(ii), Income Tax Regs., provides generally that under an accrual method of accounting—

Income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. * * *

Respondent urges that there were contingencies preventing accrual of the income in the taxable year 1975, namely ratification by the National Assembly, the likelihood of further unrest or price rises resulting in lower levels of purchases by Gulf, and the possibility that the full value of the discount might not be recovered upon resale. The

Nationalization Agreement did contain a condition subsequent requiring the approval of the National Assembly, which, although not an absolute certainty, was expected particularly in light of the limitation of the compensation to be paid for the Concession to the amounts set by the OPEC formula. Gulf also had assurances of approval from very responsible Kuwait officials. The agreements, including the crude oil supply agreement, were not subject to such ratification and thus not contingent upon the Nationalization Agreement.

Respondent's second point is also not persuasive. Kuwait and Gulf had a longstanding relationship that had been generally amicable over the course of 20 years. By its terms, the crude oil supply agreement was a binding contract until the execution of the crude oil supply contract, and the parties to the agreement abided by the terms of the two documents. Petitioner did not expect any difficulties with performance under the agreement as it was mutually beneficial to both parties that Gulf market the crude oil and permit Kuwait to maintain the level of oil production. Although there were provisions for reduction of production in the event of noncompetitive prices, the reasonable expectation was that the parties would be able to reach agreement.

In a market of oscillating, but generally rising oil prices, Gulf expected to and did resell the oil, originally sold by Gulf Kuwait to Transocean, to affiliated and third-party customers at prices that may or may not have been greater than the discounted price paid by petitioner to Kuwait. Transocean's profit upon resale, or lack thereof, does not affect whether or not Gulf Kuwait received income upon its sale to Transocean at pre-discount prices after having purchased the oil at the discounted price.

Respondent emphasizes that the pre-discount price was subject to constant variation over the term of the agreement. This is true. The difference between the pre-discount and post-discount prices, however, was a constant set by the agreement at 15 cents. Gulf Kuwait was contractually required by the crude oil supply agreement to buy the oil at discounted prices and then resell all oil purchased at the pre-discount price in Kuwait, thereby accruing income to

Gulf Kuwait for which it had agreed to pay tax to Kuwait at the rate of 55 percent. Computation of the present value of the discount required no more than application of the contractual terms to an extrapolation from the figures available in the taxable year 1975. The precision of the computation is borne out by the fact that the value as originally computed differed by only 1 percent from the amount eventually received by Gulf Kuwait over the term of the agreement. Gulf properly accrued the present value of the total discount to be received by Gulf Kuwait over the course of the crude oil supply agreement in the taxable year 1975, but the accrued amount must be recognized as ordinary income, not as gain under section 1231.[7]

Gulf also accrued the full amount of the taxes to be paid to Kuwait with respect to the difference between the pre-discount and post-discount prices and claimed the taxes paid, after application of the section 907 limitation, as a credit. We must determine whether the accrual of the total amount was proper and whether the accrued amount is allowable as a deduction or as a credit. An accrual basis taxpayer may deduct an item in the year in which all events necessary to determine both the fact and the amount of liability have occurred. *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981); secs. 1.446-1(c)(1)(ii), 1.461-1(a)(2), Income Tax Regs. Section 905(a) sets forth the general rule for the accrual of foreign tax credits:

The credits provided in this subpart may, at the option of the taxpayer and irrespective of the method of accounting employed in keeping his books, be taken in the year in which the taxes of the foreign country or the possession of the United States accrued * * *

The taxes to be paid to Kuwait were properly accrued by Gulf whether the income taxes to be paid with respect to the discount to be received under the crude oil supply agreement are deductible or allowable as a credit as they could be calculated with reasonable accuracy in the taxable year 1975 by mere mathematical extrapolations from the

---

[7]On the return petitioner reported $276,517,903 as gain under sec. 1231. The Commissioner determined that petitioner should have reported no gain under sec. 1231. He, instead, allowed a loss under sec. 1231 in the amount of $133,638. He also determined that petitioner realized ordinary income under the contract in the amount of $952,469. He made no determination in the alternative nor did he seek to amend his answer to ask for an increased deficiency.

present value of the discount to be granted to petitioner. The amount of the income to be received by petitioner necessarily depended both upon later sales and the uncertainties of the market price for Kuwaiti crude oil. The amount of tax to be paid to Kuwait, however, was fixed as 55 percent of a discount of 33 1/3 cents, a definite figure that needed no more than a valuation to present terms to be accrued in light of our finding that the parties anticipated full performance of the agreement. *United States v. Anderson*, 269 U.S. 422, 441 (1926).

The parties, however, disagree principally as to whether the accrued Kuwaiti taxes may be deducted or credited on petitioner's return for the taxable year 1975. The general rule is that such accrued foreign taxes are deductible unless the special provisions of section 901 apply. Sec. 164(a). Section 901(a) allows a taxpayer to elect, subject to certain limitations,[8] to take a credit against U.S. income tax for the amounts described in section 901(b):

SEC. 901(b). AMOUNT ALLOWED.—Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; * * *

---

[8]Sec. 901(e) reduces the amount of allowable credit under certain circumstances:

SEC. 901(e). FOREIGN TAXES ON MINERAL INCOME.—

(1) REDUCTION IN AMOUNT ALLOWED.—Notwithstanding subsection (b), the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or possession of the United States with respect to foreign mineral income from sources within such country or possession which would (but for this paragraph) be allowed under such subsection shall be reduced by the amount (if any) by which—

(A) the amount of such taxes (or, if smaller, the amount of the tax which would be computed under this chapter with respect to such income determined without the deduction allowed under section 613), exceeds

(B) the amount of the tax computed under this chapter with respect to such income.

(2) FOREIGN MINERAL INCOME DEFINED.—For purposes of paragraph (1), the term "foreign mineral income" means income derived from the extraction of minerals from mines, wells, or other natural deposits, the processing of such minerals into their primary products, and the transportation, distribution, or sale of such minerals or primary products. Such term includes, but is not limited to—

(A) dividends received from a foreign corporation in respect of which taxes are deemed paid by the taxpayer under section 902, to the extent such dividends are attributable to foreign mineral income, and

(B) that portion of the taxpayer's distributive share of the income of partnerships attributable to foreign mineral income.

If, however, the income taxes paid or accrued to a foreign country were in connection with the purchase and sale of oil or gas extracted in that foreign country, section 901(f) disallows the tax credit unless certain conditions are met:

SEC. 901(f). CERTAIN PAYMENTS FOR OIL OR GAS NOT CONSIDERED AS TAXES.—Notwithstanding subsection (b) and sections 902 and 960, the amount of any income, or profits, and excess profits taxes paid or accrued during the taxable year to any foreign country in connection with the purchase and sale of oil or gas extracted in such country is not to be considered as tax for purposes of section 275(a) and this section if—

 (1) the taxpayer has no economic interest in the oil or gas to which section 611(a) applies, and

 (2) either such purchase or sale is at a price which differs from the fair market value for such oil or gas at the time of such purchase or sale.

The third issue, therefore, is whether the income taxes payable to Kuwait over the term of the crude oil supply agreement that were directly attributable to the discounted amounts should be disallowed as creditable taxes under section 901(f). Respondent contends that petitioner neither paid fair market value for the oil (because of the discount) nor retained an economic interest[9] after March 5, 1975, and that the taxes are, therefore, not allowable as creditable taxes under section 901(f). Petitioner has conceded that it did not have an economic interest in the minerals in place in Kuwait after March 5, 1975. Furthermore, petitioner has presented no evidence that the notified or pre-discount price set by contract as the purchase and sales price for the oil was equal to fair market value.

Petitioner, however, argues that the section 901 limitation

---

[9]An economic interest is defined generally in sec. 1.611-1(b)(1), Income Tax Regs.:

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. For an exception in the case of certain mineral production payments, see section 636 and the regulations thereunder. A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. * * *

See *Freede v. Commissioner*, 86 T.C. 340 (1986); *Gulf Oil Corp. v. Commissioner*, 86 T.C. 115 (1986); *Husky Oil Co. v. Commissioner*, 83 T.C. 717, 739-741 (1984), on appeal (10th Cir., Oct. 24, 1985).

on foreign tax credits is inapplicable to taxes paid on the proceeds of nationalization. Petitioner contends that respondent has recognized that certain discounts on the purchase of oil from a foreign government may constitute consideration for the nationalization of extraction assets, citing examples from the regulations issued pursuant to section 907.[10] The relevant portions of section 1.907(c)-1(b)(3), Income Tax Regs.,[11] provide:

> (3) *Other circumstances.* Gross income from extraction or the sale or exchange of assets described in section 907(c)(1)(B) includes income from any arrangement, or a combination of arrangements or transactions, to the extent the income is in substance attributable to the extraction of minerals or such a sale or exchange. For instance, a person may have gross income from such a sale or exchange if the person purchased minerals from a foreign government at a discount and the discount reflects an arm's-length amount in consideration for the government's nationalization of assets that person owned and used in the extraction of minerals.
>
> \*    \*    \*    \*    \*    \*    \*
>
> (5) *Income not included.* Extraction income as otherwise determined under this paragraph (b), nevertheless, does not include income to the extent attributable to marketing, distributing, processing or transporting minerals or primary products. Income from the purchase and sale of minerals is not ordinarily extraction income under this subparagraph (5). If the foreign taxes paid or accrued in connection with income from a purchase and sale are not creditable by reason of section 901(f), that income is not extraction income. A taxpayer to whom section 901(f) applies is not a producer.

Citation to this regulation is, however, inapposite as it assumes arguendo that the income at issue is in consideration for the nationalization of assets and that the limitation of section 901(f) has been successfully bypassed. As discussed above, we are unable to find that the consideration for the nationalization was in excess of the amount set forth in the Nationalization Agreement, i.e., the

---

[10]Issues relating to the proper interpretation and application of sec. 907 to the amount of petitioner's creditable foreign taxes were specifically not severed or set for trial despite the fact that inclusion of those issues might have prevented some overlap of facts upon later trial. We, therefore, consider petitioner's argument to be only by way of analogy and not an attempt to have us determine whether sec. 907 applies to the facts before us, an issue that is expressly not before the Court at this time. Both parties will be at liberty to settle or to litigate the issue of the sec. 907 limitation on the credit for taxes paid with respect to foreign oil and gas extraction income at a later date.

[11]Sec. 1.907(c)-1(b)(3), Income Tax Regs., applies to taxable years ending after Dec. 31, 1974, and beginning before Jan. 1, 1983, T.D. 7961, 1984-2 C.B. 130, 131, 139.

$25,250,000 paid for the physical assets in accord with the OPEC formula. It is indisputable that Gulf Kuwait purchased the oil at the discounted price set forth in the crude oil supply agreement. This discount, however, appears to have been granted by Kuwait in recognition of Gulf's importance to the marketing of Kuwaiti crude and as part of the commercial arrangements for the new regime after the oil crisis.

In light of our finding that the discount was not a part of the proceeds of nationalization, section 901(f) operates to disallow the foreign tax credit for the taxes accrued with respect to the discount in the taxable year 1975.

We have found in favor of respondent as to the characterization of the income from the discount, in favor of petitioner as to the accrual of the value of the discount and the taxes to be paid to Kuwait, and in favor of respondent with respect to allowance of the accrued taxes as a deduction rather than a credit. Resolution of these issues and others will require a Rule 155 computation. We again point out that this opinion resolves certain severed issues only, and that all other issues not previously decided in this case[12] are still before the Court.

---

[12]The issue designated by the parties as the "North Sea Farmout" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 84 T.C. 447 (1985), while the "Iranian Foreign Tax Credit" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 86 T.C. 115 (1986).