T.C. Memo. 1996-555

UNITED STATES TAX COURT

CARL GOUDAS AND MARILYN GOUDAS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1448-94.                    Filed December 23, 1996.

<u>Frederick N. Widen</u> and <u>Benjamin J. Ockner</u>, for petitioners.

<u>Terry W. Vincent</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined a deficiency of
$230,158 in petitioners' 1988 Federal income tax, and additions
to tax of $11,508 and $57,540, respectively, under sections

6653(a) and 6661.[1]  The deficiency arose from respondent's determination that petitioner[2] had a distributive share of $827,968 in the partnership gain on the sale of a shopping mall by Pecaris Enterprises (Pecaris), a partnership in which petitioner has a 25-percent interest, to Coastal Investments Co. (Coastal), a partnership in which he has a 90-percent interest.

We hold that petitioner's distributive share of partnership gain that Pecaris realized on the sale of the Mall is $827,968, the amount determined by respondent, although we arrive at that destination by a somewhat different route than respondent would have had us follow.  We reject respondent's determination of the additions to tax.

FINDINGS OF FACT

Some of the facts have been stipulated, and are so found. The stipulation of facts and attached exhibits are incorporated herein.  When petitioners filed their petition, they resided in Ohio.

[1]Unless otherwise identified, section references are to the Internal Revenue Code in effect for 1988, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Marilyn Goudas has an interest in this case solely by virtue of having filed a joint 1988 Federal income tax return with her husband.  Accordingly, all references to petitioner in the singular are to Carl Goudas.

Petitioner was born in Greece and came to the United States at age 12. He attended grammar school in the United States, with his last grade level attended being the fifth grade at age 15.

Petitioner has been a commercial real estate broker for several years, acting primarily as a broker of strip shopping centers.

Petitioner has limited knowledge of Federal income taxes, and relied on professional advisers for tax advice and the preparation of his tax returns. Martin Sugarman, a certified public accountant, prepared petitioners' 1988 Federal income tax return in accordance with the instructions of Ken McPhaill, a tax manager of a national accounting firm, who died prior to the trial of this case. Mr. McPhaill orally advised Coastal on the overall Federal income tax treatment of the transaction at issue, and his firm prepared Coastal's 1988 return of partnership income.

Pecaris Partnership

In 1975, petitioner, with Christ Spillas and Peter Boyas, formed Pecaris, an Ohio general partnership. Pecaris was formed to acquire commercial real estate, and acquired and held various properties.

Mr. Boyas provided the initial financing for Pecaris, but has had no role in its day-to-day affairs. Mr. Spillas collected and posted rents and paid payables, kept the books of the

partnership, acted as the tax matters partner, and provided information to the accounting firm that prepared the partnership returns of income. Petitioner acted as managing partner, with the primary responsibility of identifying and proposing properties for purchase by Pecaris and acting on its behalf in the purchase and sale of properties.

In 1976, Pecaris purchased a strip shopping center known as the North Shore Mall (the Mall), located in Willowick, Ohio, at a cost of $2.8 million.

In April 1978, the terms of the Pecaris partnership were memorialized in a written partnership agreement. Under the terms of the Pecaris partnership agreement, petitioner and Mr. Spillas each has a 25-percent interest in profits and losses, and Mr. Boyas has a 50-percent interest. The Pecaris partnership agreement contains no express provision regarding how it can be amended. However, in January 1985, petitioner and Messrs. Boyas and Spillas executed a written amendment to the Pecaris partnership agreement that replaced its original provisions concerning disposition of interests in the partnership on retirement or death of a partner.

Coastal Partnership

At monthend November 1987, petitioner and Vincent Giorgi formed Coastal, an Ohio general partnership, for the purpose of acquiring, owning, leasing, and operating commercial real estate.

Coastal was specifically formed for the purpose of acquiring the Mall.

From inception, the terms of the Coastal partnership were memorialized in a written partnership agreement, which provides that it can be amended only by written agreement of the partners. Under the terms of the Coastal partnership agreement, petitioner has a 90-percent partnership interest and Mr. Giorgi has a 10-percent partnership interest, and their interests in cash-flow, profits, losses, and tax credits follow their partnership interests. The Coastal partnership agreement obligates the partners to contribute to the partnership, as initial capital, in proportion to their interests in the partnership, the amounts needed to acquire the Mall and provide initial working capital.

The Coastal partnership agreement designates Mr. Giorgi, who is a certified public accountant, as the tax matters partner. Mr. Giorgi is the financial manager of Coastal, and he consulted Mr. McPhaill in connection with the preparation of Coastal's initial book entries and 1988 return of partnership income.

Disposition and Acquisition of the Mall

On December 17, 1987, Pecaris and Coastal entered a written agreement under which Coastal agreed to purchase the Mall from Pecaris for $4.8 million, which Coastal agreed to pay upon the following terms: $100,000 in "Cash or check herewith as earnest money to be held in escrow by" HGM Hilltop Realty (HGM), a realty

company for which petitioner worked as a broker;[3] $600,000 to be deposited in escrow; and $4.1 million, to be paid from the proceeds of a first mortgage nonrecourse loan to be obtained by Coastal from Canada Life Assurance Co. (Canada Life). The $4.1 million amount of the mortgage loan was the maximum that Canada Life was willing to lend on the security of the Mall, based on Canada Life's valuation of the Mall at approximately $5.5 million and use of a 75-percent maximum loan-to-value ratio.

Also on December 17, 1987, petitioner, using a preprinted HGM commission agreement form, wrote a commission agreement between Pecaris and HGM for payment by Pecaris of $100,000 to HGM for effecting the sale of the Mall from Pecaris to Coastal. The commission agreement authorized "ESCROW AGENT * * * by irrevocable assignment, to disburse to HGM HILLTOP, REALTORS a check in the amount of $100,000.00". Petitioner signed this agreement as a partner of Pecaris; the HGM signature line was left blank.

Petitioner, as partner in both Coastal and Pecaris, was on both sides of the negotiation of the purchase agreement and the fixing of the purchase price. Messrs. Boyas and Spillas and petitioner signed the purchase agreement on behalf of Pecaris,

---

[3]There is no evidence in the record that the earnest money was ever placed in escrow or any indication of the nature or extent of the ownership or employment relationship between petitioner and HGM.

and Mr. Giorgi signed the purchase agreement on behalf of Coastal.  Petitioner acted on behalf of both Pecaris and Coastal in consummating the transaction.

On the basis of Canada Life's valuation, the Mall had some value in excess of the stated purchase price of $4.8 million. However, there is no other evidence in the record that bears on the fair market value of the Mall or of petitioner's 25-percent partnership interest in Pecaris, either in gross or with respect to his partnership interest in Pecaris attributable to its ownership of the Mall.  Petitioner's proportionate interest in the Mall was subject to liabilities and closing costs of $504,314, giving him a net equity interest in the Mall of $695,686, if its value should be deemed to be the agreed purchase price of $4.8 million.[4]

--------

[4]The liabilities and closing costs to which the Mall and a 25-percent interest therein were subject were as follows:

| | | |
|---|---:|---:|
| Stated purchase price of Mall . . . . . . . . . . . . . | | $4,800,000 |
| Capco Enterprises mortgage | $1,765,344 | |
| Security deposits | 35,445 | |
| Real property taxes | 23,380 | |
| Prepaid rents | 19,532 | |
| Adjustment for real estate commission | 100,000 | |
| Closing costs | 73,553 | 2,017,254 |
| Pecaris equity in Mall, valued at $4.8 million  . . . . . . . . . . . . . . . . . . . | | 2,782,746 |
| 25 percent of stated purchase price of Mall  . . . . | | 1,200,000 |
| 25-percent share of costs and liabilities  . . . . . . . . . . . . . . . . . . . . . | | 504,314 |
| Petitioner's 25-percent equity in Mall, if it should be valued at $4.8 million stated purchase price . . . . . . . . | | 695,686 |

Petitioner hired Continental Title Co. (Continental) to provide escrow services and title insurance for the transaction. The conveyance, assignment, and transfer by Pecaris to Coastal of the Mall real property, leases, and tangible personal property all occurred in February 1988. The purchase agreement as written contemplated a straight sale of the Mall to Coastal for $4.8 million cash, and the fee paid to Continental was determined on the basis of that stated purchase price.[5] However, petitioner and Mr. Giorgi lacked the personal resources that would have enabled Coastal to pay the additional $700,000 in cash required to consummate the transaction for the stated purchase price of $4.8 million. The escrow and financing statements show that only $4.1 million of mortgage loan proceeds were deposited in the escrow account, and that the $700,000 shortfall was made up of credits in that amount.

The $700,000 of credits was attributable to two items: First, petitioner informed Continental, in writing, that HGM had "received a note from Coastal * * * in the amount of $100,000 * * * in payment in full from Pecaris" to HGM of the commission due from Pecaris for petitioner's handling of the sale of the Mall. The record contains no evidence that the $100,000 deposit called for by the purchase agreement was ever made, or that any

---

[5]In addition, the real property transfer tax of $4,800 represented a $1 payment per $1,000 paid as consideration for the transfer.

such note was issued by Pecaris or Coastal (see supra note 3, infra note 10), or that the commission was otherwise paid. Second, petitioner informed and instructed Continental, in writing, that he had "already collected as down payment $600,000 so give Pecaris credit for the $600,000 and deduct same from Carl Goudas share of distribution" (sic) from the escrow account.

In accordance with petitioner's instructions to Continental, the credits were shown by entries in the escrow account. Continental's escrow statement to Coastal showed a credit from Pecaris to petitioner in the amount of $700,000. Continental's escrow statement to Pecaris, in addition to showing the cash balances due petitioner and Messrs. Boyas and Spillas from the escrow account, showed a credit to petitioner of $600,000, and recited that the real estate commission had been paid to HGM by promissory note in the amount of $100,000.

Soon after the conveyance of the Mall by Pecaris, Coastal recorded, in its general journal, a contribution to capital by petitioner in the amount of $700,000. Pursuant to the Coastal partnership agreement, petitioner intended, and was expected by Mr. Giorgi, to contribute or cause to be transferred to Coastal an interest in the Mall in lieu of a cash contribution. Petitioner made no other contribution to the capital of Coastal during 1988. Mr. Giorgi initially contributed $70,100 to the capital of Coastal, and an additional $6,151 later during the year. During 1988, petitioner and Mr. Giorgi received cash

distributions from Coastal that exceeded their reported distributive shares of partnership income for the year.

Messrs. Boyas and Spillas received direct cash payments by Continental from the escrow account in proportion to their partnership interests, in the amounts of $1,391,566 and $695,783, respectively. Petitioner received a direct cash payment from the escrow account in the amount of $95,783, based on petitioner's $695,783 net interest in the Mall (equivalent to the interest of Mr. Spillas) minus the above-mentioned $600,000 credit.[6] These cash payments to the Pecaris partners represented the bulk of the proceeds from the $4.1 million Canada Life mortgage loan that remained after the pay-off of the liabilities and closing costs to which the Pecaris partnership's interest in the Mall had been subject. According to the escrow statement prepared by Continental for Coastal, $78,063 of the mortgage loan proceeds was paid to Coastal as "excess loan proceeds".

Petitioner also received another cash payment from the escrow account in the amount of $30,000. This payment was a

[6]The difference between these amounts and the calculation supra in note 4, is attributable to a small amount of interest received on the overnight investment of the mortgage loan proceeds by or on behalf of Coastal:

|  | 100 percent | 25 percent |
| --- | --- | --- |
| Pecaris equity in Mall, valued at $4.8 million . . . | $2,782,746 | $695,686 |
| Interest on investment of mortgage loan proceeds . . . . . . . . . . . . . . . | 388 | 97 |
|  | 2,783,134 | 695,783 |

commission from Capco Enterprises, the mortgagee under the preexisting mortgage on the Mall that was satisfied as a result of the consummation of the transaction. See <u>supra</u> note 4. The record does not show whether petitioner included the amount of this commission in the income reported on the Schedule C of petitioners' 1988 Federal income tax return.

Upon conveyance of the Mall from Pecaris to Coastal, petitioner's partnership interest in the Mall, by virtue of the difference between his interests in Pecaris and Coastal, increased from 25 percent to 90 percent, without any outlay of funds by him. As a result, petitioner's share of mortgage liabilities associated with the Mall increased from $441,336 (25 percent of the Capco Enterprises mortgage to which the Mall was subject in the hands of Pecaris) to $3,690,000 (90 percent of the Canada Life mortgage loan of $4.1 million to which the Mall became subject in the hands of Coastal at the time of the conveyance.[7]

Messrs. Boyas and Spillas did not become aware of petitioner's partnership interest in Coastal, and of his participation on both sides of the transaction, until after the

---

[7]Canada Life viewed the transaction as both a refinancing of the Mall, and as a "buying out" by petitioner of the interests of the other Pecaris partners. In addition, the loan agreement stated that "The purpose of the loan is to provide permanent financing for the Real Property and to discharge all existing financing."

sale of the Mall had been consummated.[8]  Upon being informed of petitioner's participation in Coastal, they did not voice any objection or take any action against petitioner.  The Pecaris partnership continues, with petitioner and Messrs. Boyas and Spillas retaining their respective partnership interests in the remaining assets and liabilities of the partnership.

Tax Reporting of the Transaction

Pecaris reported the transaction on its Form 1065 U.S. Partnership Return of Income as a sale of the Mall for $4.8 million with a realized and recognized gain of $3,311,873.[9] Pecaris used the $100,000 commission as an offset to reduce the gain reported on its 1988 return of partnership income as distributable to petitioner and Messrs. Boyas and Spillas.

---

[8]Mr. Spillas testified that he did not know the identity of the principal parties of Coastal at the time of the transaction, but became aware of petitioner's interest in Coastal prior to the filing of the Pecaris 1988 partnership return, which Mr. Spillas signed on behalf of Pecaris.  Mr. Boyas testified that he did not recall when petitioner's identity as a partner in Coastal was revealed to him, but that the reason for his inability to recall was that he regarded petitioner's role on the other side of the transaction as unimportant.

[9]On its 1988 Form 1065 and Form 4797, Pecaris reported and computed the gain on the sale of the Mall as follows:

| | | |
|---|---|---|
| Gross sales price . . . . . . . . . . . . | | $4,800,000 |
| Cost or other basis plus | | |
| expenses of sale  . . . . . | $3,022,670 | |
| Depreciation allowed  . . . . | 1,534,543 | |
| Adjusted basis  . . . . . . . | | 1,488,127 |
| Total gain  . . . . . . . . . . . . . . | | 3,311,873 |

Pecaris allocated the gain to its three partners in accordance with their interests in profits, as specified in the Pecaris partnership agreement. Accordingly, Pecaris reported petitioner's distributive 25-percent share of the gain from the sale, $827,968, on its Schedule K-1, and that is the amount of the adjusting increase in petitioner's gain as determined in respondent's statutory notice to petitioner.

Coastal and petitioner reported the transactions affecting petitioner's interest in the Mall as nontaxable transactions on their respective returns for 1988. The yearend tax balance sheet, Schedule L of Coastal's 1988 Form 1065, disregarded petitioner's capital contribution of $700,000 as having any effect for tax purposes on petitioner's capital account or on Coastal's basis in the Mall, and showed Coastal as having a cost basis in the Mall substantially less than $4.8 million, on the order of what would have been approximately $4.1 million as of the time of the conveyance of the Mall by Pecaris to Coastal.[10]

---

[10]The Coastal 1988 yearend Schedule L Tax Balance Sheet and schedules thereto do not disclose or show any note or other obligation of Coastal to HGM in respect of the $100,000 commission. The Coastal balance sheet and Schedule M Reconciliation of Partners' Capital Accounts show the following:

Schedule L - Balance Sheet

Assets

| | | | |
|---|---|---|---|
| Cash | $74,886 | Current liabilities | $102,026 |
| Trade accounts and receivables | 78,159 | Mortgages, etc. | 4,071,244 |

(continued...)

Petitioners reported no distributive share of gain to petitioner from Pecaris in respect of the Mall transaction on their 1988 Form 1040. Petitioners attached Form 8082 (Notice of Inconsistent Treatment or Amended Return) to their 1988 Form 1040, disclosing that petitioner was taking a position inconsistent with the Schedule K-1 filed by Pecaris. Petitioners' Form 8082 showed a reduction to zero in the amount of the Pecaris reported section 1231 gain of $827,968 attributed to petitioner and provided the following explanation: "Traded up Real Estate Interests in Like-Kind Exchange." Petitioners' Form 8082 did not disclose that the $100,000 real estate brokerage commission used by Pecaris as an offset in computing its gain on

---

[10](...continued)

| | | | | |
|---|---|---|---|---|
| Buildings and other depreciable assets | $3,459,502 | | Partners' capital | (182,469) |
| Minus depreciation | 113,936 | 3,345,566 | | |
| Land | | 458,845 | | |
| Other assets | | 33,345 | | |
| | | | Total liabilities | |
| Total assets | | 3,990,801 | and capital | 3,990,801 |

Schedule M - Reconciliation of Partners' Capital Accounts

| | Capital beginning of year | Capital contributed | Income | Withdrawals | Capital end of year |
|---|---|---|---|---|---|
| Petitioner | - 0 - | - 0 - | $7,450 | $258,399 | ($250,949) |
| Giorgi | - 0 - | $76,251 | 329 | 8,100 | 68,480 |
| Total | - 0 - | 76,251 | 7,779 | 266,499 | (182,469) |

the sale of the Mall had not been included by petitioner in his gross income.

OPINION

We address one procedural or evidentiary issue and two sets of substantive tax issues:  First, whether we are permitted to look beyond the terms of the purchase agreement and the Pecaris partnership agreement to determine the gain realized by Pecaris on the sale of the Mall; and second, the amount of the Pecaris gain for tax purposes and the amount thereof to be allocated to petitioner, and the correlative questions of the tax treatment of the credits or their equivalents received by Pecaris and petitioner and contributed by petitioner to the capital of Coastal.  We then consider the additions to tax.

I.  Whether Danielson Requires Agreement With Respondent's Determination

Respondent determined and continues to argue that Pecaris agreed to sell and did sell the entire Mall to Coastal for $4.8 million, and that petitioner's recognized gain on his distributive 25-percent share of partnership gain from the sale of the Mall is $827,968.  Petitioners argue that the transaction should be treated as a sale by Pecaris of a 75-percent undivided interest in the Mall for $3.6 million, no part of the gain on which is allocable to him, and a distribution by Pecaris-- nontaxable to him under section 731--of a 25-percent undivided interest in the Mall, followed by his contribution--nontaxable to

him under section 721--to Coastal of that interest,[11] with the
remaining $500,000 of mortgage loan proceeds being used to
discharge the portion of the transaction expenses and preexisting
liabilities attributable to his 25-percent undivided interest
received from Pecaris and contributed to Coastal.

Under petitioners' view, Pecaris was entitled to use 75
percent of its adjusted basis in the Mall in computing its gain
on the receipt of the reduced purchase price of $3.6 million for
the 75-percent undivided interest that it sold and the
distributive shares of such gain to Messrs. Boyas and Spillas.
Applying petitioners' view, those shares of gain would remain the
same as reported by Pecaris and Messrs. Boyas and Spillas on
their returns, and no part of the Pecaris gain would be allocable
to petitioner.  Also, under petitioners' view, the remaining 25
percent of the Pecaris adjusted basis in the Mall is attributable
to the undivided 25-percent interest therein that petitioner
claims was distributed to him by Pecaris and contributed by him
to the capital of Coastal.

---

[11]The rationale of allowing nonrecognition treatment to
petitioner under secs. 721 and 731 of the continuation and
expansion of his residual partnership interest in the Mall would
be that he did not liquidate his investment in the Mall but
rather continued it in another form, with a greater proportionate
interest, subject to nonrecourse liabilities that were
substantially increased both proportionately and absolutely.
See sec. 1.1002-1(c), Income Tax Regs.

At the calendar call of the session of the Court at which
this case was tried, respondent filed a motion in limine to
"exclude all evidence pertaining to an alleged oral modification
made to the written sale agreement * * * as inadmissible pursuant
to the principles espoused by the Tax Court in Estate of Durkin
v. Commissioner, 99 T.C. 561 (1992)"[12] and by the Court of
Appeals for the Third Circuit in Commissioner v. Danielson, 378
F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549
(1965). These cases stand, in respondent's view, for the

_____

[12]In Estate of Durkin v. Commissioner, 99 T.C. 561 (1992),
the taxpayer decedent had not disclosed on his income tax return
his bargain purchase of assets from a closely held corporation,
and his bargain sale of his shares to the other shareholder, so
as not to report any gain. The Court rejected the argument of
his personal representative and surviving spouse that the
transactions were in substance a redemption or sale of his stock
at a capital gain, the Commissioner having discovered the bargain
purchase on audit and determined it to be a constructive
dividend. We found that decedent had not exhibited "an honest
and consistent respect for the substance of * * * [the]
transaction", Id. at 574 (quoting Estate of Weinert v.
Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), revg. and
remanding 31 T.C. 918 (1959)). Decedent had reported the
transactions on his tax return consistently with the form in
which they were cast, and the effort of his successors in
interest to restructure the transaction to track its alleged
substance was a litigation strategy developed years later in
response to our previous opinion in Estate of Durkin v.
Commissioner, T.C. Memo. 1992-325, upholding the Commissioner's
determination that the value of the purchased assets
substantially exceeded the price paid by decedent. Moreover, the
Commissioner's challenge to the price paid by decedent to the
corporation did not open the door for the successors in interest
to disavow the form of the transactions: "To hold otherwise
would at a minimum be an untoward invitation to the kind of
mispricing and concealment that petitioners attempted here".
Estate of Durkin v. Commissioner, 99 T.C. at 575.

proposition that taxpayers may disavow the form of their transactions to challenge the tax consequences flowing therefrom "only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Id. at 775.

Respondent argued that, under Danielson and Estate of Durkin, petitioner was bound by the terms of the purchase agreement, which characterized the transfer of the Mall, and the subsequent tax reporting of the transaction by Pecaris and petitioner's partners in accordance with the terms of the Pecaris partnership agreement, as a straight cash sale of the Mall for $4.8 million with 25 percent of the distributive share of the Pecaris partnership gain therefrom allocable to petitioner.

Insofar as Estate of Durkin v. Commissioner, supra, is concerned, we observe that petitioner did not conceal or otherwise fail to report the transaction on his income tax return. Petitioners' income tax return disclosed that petitioner was taking a return position inconsistent with that of Pecaris and his fellow partners, Messrs. Boyas and Spillas. Petitioner's concealment was in failing to disclose to Messrs. Boyas and Spillas his position on the other side of the Mall transaction as the dominant partner of Coastal, and in failing to carry through with them to request and obtain amendments of the purchase

agreement and the Pecaris partnership agreement to provide for a part sale of the Mall to Coastal and a special allocation that would have been consistent with the position he took on his own income tax return and that he now takes in this case.

We denied respondent's motion at the calendar call, "without prejudice to renew in the brief after we've had a trial". Respondent's brief in answer, after observing that "At this juncture, the motion in limine to preclude the introduction of evidence is moot", went on, without disavowing respondent's position on the motion, in effect to broaden her position to encompass the Pecaris partnership agreement:

> After further reflection, and as noted by the Court (Motion Hearing Tr. 9) during the oral presentation of respondent's motion, it may well be that respondent imprecisely placed the focus of her motion on the wrong agreement.

> The record is clear that the purchase/sale Agreement, bolstered by the additional written instruments memorializing and consummating the sale of the Mall are entirely consistent with the manner in which Pecaris reported the transaction. Additionally, this consistency continues through the allocation of the gain from the transaction per the written Pecaris partnership agreement.[14] (Ex. D (par. 4.)) As suggested by the Court, this partnership agreement may be the critical "agreement" which petitioner is attempting to modify.

> [14]Per the written partnership agreement, petitioner was entitled to share in one-fourth (25%) of the profits and losses of the Pecaris partnership enterprise.

The Court of Appeals for the Sixth Circuit has adopted the Danielson rule, North Am. Rayon Corp. v. Commissioner, 12 F.3d

583, 587-589 (6th Cir. 1993), affg. T.C. Memo. 1992-610, and does not confine it to cases of allocation of payments to covenants not to compete, Schatten v. United States, 746 F.2d 319, 321-322 (6th Cir. 1984). Although this Court generally applies the "strong proof" rule originally enunciated in Ullman v. Commissioner, 29 T.C. 129 (1957), affd. 264 F.2d 305 (2d Cir. 1959), we are bound to apply the Danielson rule if we are satisfied that the Court of Appeals to which the case is appealable would do so, Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971); Lardas v. Commissioner, 99 T.C. 490 (1992); Lang v. Commissioner, T.C. Memo. 1993-474.

In arguing that we should look beyond the express terms of the purchase agreement, petitioners don't contend that the agreement was entered into under any mistake, undue influence, fraud, duress, or the like. Instead, petitioners dispute the substance of the transaction, asserting that the purchase agreement alone doesn't express the reality of the transaction as actually consummated by the parties.

We're satisfied that the Danielson rule doesn't confine petitioner's tax treatment to the terms of the purchase agreement. We so hold because the purchase agreement alone didn't reflect the entirety of the subsequently consummated transaction that actually occurred. We have not only looked at

the purchase agreement, but also to the other operative documents, including the mortgage loan agreement and escrow documents, as well as the instruments of conveyance, assignment, and transfer used to accomplish the property transfers, and the Pecaris and Coastal partnership agreements, to determine the integrated, overall agreement between the parties that was actually consummated. In re Steen, 509 F.2d 1398, 1403 (9th Cir. 1975); 3 Corbin on Contracts, secs. 581-582 (West 1960 & Supp. 1994).[13] Furthermore, as the Court of Appeals for the Ninth Circuit said in In re Steen, supra at 1403 n.5, parol and extrinsic evidence are admissible to show that the true consideration paid and received was different from that stated in the agreement (quoting Haverty Realty & Inv. Co. v. Commissioner, 3 T.C. 161, 167 (1944)):

> Turning now to the question of consideration: "* * * the recitals of a written instrument as to the consideration received are not conclusive, and it is always competent to inquire into the consideration and show by parol or other extrinsic evidence what the real consideration was." Deutser v. Marlboro Shirt Co.

---

[13]The Danielson rule encompasses and mirrors the parol evidence rule, Commissioner v. Danielson, 378 F.2d 771, 779 (3d Cir. 1967), vacating. and remanding 44 T.C. 549 (1965); Schmitz v. Commissioner, 51 T.C. 306, 317 (1968), affd. sub nom. Throndson v. Commissioner, 457 F.2d 1022 (9th Cir. 1972). Because the parol evidence rule does not exclude evidence where there is a series of transactional documents that must be read together before the agreement is treated as wholly integrated, 3 Corbin on Contracts, secs. 581-582 (West 1960 & Supp. 1994), the Danielson rule applies only after all those documents have been aggregated to form the overall agreement.

(C.C.A., 4th Cir.), 81 Fed. (2d) 139, 142, citing many authorities.  * * *

The foregoing analysis satisfies us that the entire record is available for our review to help us determine the gain realized by and recognized to Pecaris on the sale of the Mall. The record makes abundantly clear that the cash consideration paid by or on behalf of Coastal was substantially less than the stated purchase price of $4.8 million, thereby providing a toehold for petitioner's argument that we should not impute realized gain to Pecaris by reference to any more than the cash consideration actually paid and received.  Cf. Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579-580 (1977) (quoting Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974)); Bartels v. Birmingham, 332 U.S. 126, 130-132 (1947).  But that's not the end of the matter; we must consider whether the $700,000 of credits is includable in the amount realized by Pecaris for the purpose of computing its gain on the sale of the Mall.

II.  Tax Treatment of Pecaris on Its Sale to Coastal

The parties have not shown us what the capital accounts of Pecaris actually looked like on its books before and after the Mall transaction.  It seems likely, from the way Pecaris reported the transaction on its partnership return and accompanying schedules, that Pecaris accounted for the credits as if they had been received from Coastal as cash equivalents or receipts that

were included in the reported amount realized of $4.8 million, and then distributed to petitioner.  On the Coastal side of the transaction, there's a disparity in the book and tax treatments of petitioner's participation in Coastal:  Coastal recorded on its books a contribution to capital by petitioner in the amount of $700,000; on Coastal's tax balance sheet reconciliation of partners' capital accounts, petitioner is shown as having made no capital contribution.  This disparity is reflected in Coastal's book and tax accounting for the receipt of the Mall, which was booked at a value that exceeds its tax basis by approximately the same amount as the equivalent amounts of the credits and petitioner's capital contribution.

It's the tax treatment of the credits, at both the Pecaris partnership and partner levels, over which the parties part company.

A.  <u>Amount of Pecaris Gain</u>

1(a)  <u>Amount Realized</u>

Having opened up the transaction for review, we must first determine the amount of the Pecaris gain on its sale of the Mall to Coastal.  Under section 1001(a) "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis" of the property.  Under section 1001(b), "The amount realized * * * shall be the

sum of any money received plus the fair market of the property (other than money) received."

Since the amount of money received by Pecaris did not exceed $4.1 million, we must address whether the $700,000 credit is properly includable in the amount realized by Pecaris. In this connection, Mr. Berardinelli, the president of Continental, the escrow agent, testified that it's common practice in escrowed real estate transactions for the escrow agent to make offsetting or netting entries in the escrow account to reflect offsetting obligations and to pay the net amount due to the party entitled thereto. The additional consideration given by Coastal was the $700,000 credit to petitioner's capital account in Coastal. The way in which the capital account credit served as a substitute for a $700,000 cash payment from Coastal to Pecaris can be seen by analyzing the network of obligations arising from the sale of the Mall. Coastal was obligated to pay Pecaris $700,000 over and above the proceeds of the new mortgage financing. Through a combination of petitioner's actions and the profit-sharing provisions of the Pecaris partnership agreement, Pecaris was obligated to pay to petitioner or at his direction a total of $795,783, consisting of $695,783, the 25-percent distributive share of the net proceeds of the sale, plus the $100,000 brokerage commission. Petitioner was paid $95,783 from escrow, leaving an unpaid balance of $700,000 that was satisfied by the

credits.  Under the Coastal partnership agreement, petitioner was obligated to make a capital contribution of $700,000 to Coastal. Petitioner satisfied that obligation to Coastal by causing Pecaris to transfer to Coastal all right, title, and interest in the Mall, and Coastal credited $700,000 to petitioner's capital account; as a result, petitioner became the dominant partner in Coastal, with a 90-percent interest in capital and profits. There was thus a circle of obligations in the amount of $700,000, which were netted against one another and discharged without the need for settlement in cash.  In sum, Coastal discharged its obligation to Pecaris by satisfying the Pecaris obligation to petitioner by crediting him with a $700,000 capital contribution, and petitioner's obligation to Coastal was satisfied by his causing Pecaris to transfer to Coastal all right, title, and interest in the Mall for a cash consideration that was $700,000 less than Coastal was obligated to pay under the terms of the purchase agreement.

There is one other problematic element in the computation of the amount realized by Pecaris.  The Coastal escrow statement discloses that there was a distribution to Coastal of $78,063 of excess mortgage loan proceeds.  As a result, it appears that the cash proceeds of the sale of $4.1 million should be reduced by $78,063, because Pecaris did not receive that amount in cash. However, it also appears that the amount of the mortgage proceeds

distributed to Coastal from the escrow account is approximately equal to Mall-associated liabilities of Pecaris for security deposits, real property taxes, and prepaid rents (see infra note 14) that were assumed or taken subject to by Coastal. The relief of Pecaris of responsibility for those obligations was part of the consideration received by Pecaris on the sale of the Mall. The amount realized by Pecaris on the sale of the Mall stands at $4.8 million.

(b) Pecaris Adjusted Basis

Respondent, in computing the larger gain that she determined using an amount realized of $4.8 million, of course allowed the entire adjusted basis of the Mall to be used in computing the resulting gain. It's only petitioners, in their effort to leave the tax position of petitioner's Pecaris partners unaffected, but treat petitioner as having no share of the Pecaris partnership gain, who came up with the notion that what Pecaris sold was a 75-percent undivided interest in the Mall for $3.6 million. This led to petitioners' correlative argument that the Pecaris partnership was entitled to use only 75 percent of its basis in computing the gain on that sale.

Petitioners' argument suffers from a fatal flaw. Petitioner's recharacterization of the transaction as a sale by Pecaris of a 75-percent undivided interest in the Mall and a Pecaris distribution to petitioner, followed by a contribution by

him to Coastal of a 25-percent undivided interest in the Mall, is contradicted by the express terms of the warranty deed. That deed conveyed to Coastal the entire fee interest of Pecaris in the Mall. Under Ohio law, a partnership is an entity for the purpose of owning, conveying and acquiring property, Ohio Rev. Code Ann. sec. 1775.07(C) (Baldwin 1993), and the terms of the deed, assignment, and bill of sale indicate that Pecaris conveyed directly to Coastal the entire fee interest in the Mall and the associated leases and tangible personal property. This leaves no room for petitioners' argument that petitioner received a distribution of a 25-percent undivided interest in the Mall, which he then contributed to Coastal in exchange for his partnership interest in Coastal.

We therefore reject petitioners' correlative argument. We see no reason why the Pecaris partnership should not be entitled to use its entire adjusted basis in the Mall in computing its gain on the sale. That gain is $3,311,873, as computed by Pecaris and respondent. See supra note 9.

2. Amount Recognized to Pecaris

Section 1001(c) provides:

Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

The question is whether any nonrecognition provisions of the Internal Revenue Code apply to the Mall transaction to reduce the

gain recognized to Pecaris to any amount less than the gain realized that we have already determined. Having rejected petitioner's argument that Pecaris distributed to petitioner a 25-percent undivided interest in the Mall, which he then contributed to Coastal in exchange for his partnership interest, we nevertheless observe that the creation of the partnership interest issued by Coastal to petitioner appears to have been an element of the consideration given and received by Pecaris. Petitioner so structured the transfer of the Mall to Coastal that the shortfall in the cash consideration was ultimately satisfied by his receipt of a 90-percent partnership interest in Coastal. We therefore ask whether section 721, providing for nonrecognition of gain or loss on a contribution of appreciated property to a partnership, causes any portion of the gain realized by Pecaris to be entitled to nonrecognition. In particular, did the Mall transaction amount to a transfer of the Mall by Pecaris to Coastal in exchange for cash and a partnership interest in Coastal having a value of $700,000, which Pecaris then distributed to petitioner, plus $95,683 in cash, with disproportionately greater amounts of cash being distributed to petitioner's partners in Pecaris?

It seems that a transfer of appreciated property to a partnership in exchange for a partnership interest and cash can be treated in at least three different ways: (a) Part-sale part-

contribution; (b) contribution followed by distribution of cash; or (c) contribution with a receipt of boot. See Hesch, Tax Management Portfolio 710, Partnerships; Overview, Conceptual Aspects and Formation A-98 to A-100 (1996). However, there also appears to be no authority that clearly governs the choice to be made.

None of these possibilities was raised or argued by the parties. We resist the temptation to tease out their varying tax consequences because there is nothing more in the documentation of the transaction that would allow it to be characterized more appropriately in any of these three ways than the part-sale to Coastal part-distribution by Pecaris to petitioner that we have already rejected. The overwhelmingly dominant aspect of the Mall transaction, supported both by its documentation and by the relative cash consideration paid and received, was a sale for cash. See sec. 707(a)(2)(B), enacted by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 73(a), 98 Stat. 591 (DEFRA), and DEFRA sec. 73(b), 98 Stat. 592; sec. 1.707-9(a), Income Tax Regs.; H. Rept. 98-861, at 862 (1984), 1984-3 C.B. (Vol. 2) 1, 116; see also secs. 1.721-1(a), 1.731-1(c)(3), Income Tax Regs. The Mall transaction therefore stands as a sale that was a recognition transaction to Pecaris in its entirety. We do not regard Pecaris as having made a nontaxable capital contribution to Coastal entitled to nonrecognition under section 721, but as

having received a credit, which was included in the amount realized by Pecaris (but was not itself the receipt by Pecaris of a partnership interest in Coastal in consideration of a contribution of property by Pecaris to Coastal), that enabled and entitled petitioner to receive a 90-percent partnership interest in Coastal.

B.  Petitioner's Share of Pecaris Gain

We now consider petitioner's share of the Pecaris gain as computed above.  Under the Pecaris partnership agreement, petitioner has a 25-percent interest in profits and losses.

Petitioner did not disclose to Messrs. Boyas and Spillas, prior to consummation of the Mall transaction between Pecaris and Coastal, that he was on the Coastal side of the transaction as its dominant partner.[14]  Although petitioner testified that he participated in the negotiations on both sides of the transaction, along with Mr. Spillas and Mr. Giorgi, Mr. Spillas testified that the three Pecaris partners agreed on the purchase price.  We don't believe that there were actual arm's-length negotiations between Pecaris and Coastal to fix the purchase price.  If petitioner had made Messrs. Spillas and Boyas aware

---

[14]Petitioner's nondisclosures to Messrs. Boyas and Spillas may well have violated his fiduciary duty to them as his partners, but that's another story.  See Meinhard v. Salmon, 164 N.E. 545 (N.Y. 1928), cited with approval by In re Binder's Estate, 27 N.E. 2d 939, 949 (Ohio 1940), and Restatement (First) of Restitution, sec. 190-191, 781-789 (App. 1988); see also infra text at 37.

that he intended to take less cash by reason of the credits, they might well have agreed to recast the deal and provide for a special partnership allocation, which would have reflected petitioner's receipt of a nontaxable distribution as his only interest in the Mall, so that petitioner would not have been allocated any gain from the sale of the Mall. Or, if they had been made aware of the possibly higher value of the Mall, they might have required petitioner to find an additional investor in Coastal willing to pay additional cash consideration to obtain an interest in the Mall, so as to increase the overall purchase price and the cash distributions that they would have ultimately received.

Petitioner, who had his own tax advisers, neither apprised his partners of the possible excess value of the Mall nor asked them to amend the partnership agreement (which could have been effective for allocation purposes at any time before filing the Pecaris partnership return, sec. 761(c)), to provide a special allocation that would have relieved petitioner from recognizing his distributive share of Pecaris gain from the sale of the Mall. Petitioner's partners allowed him to handle the Mall sale, and petitioner organized the buying group without telling them until after the deal was done that he had a 90-percent interest in that group. The Pecaris partnership agreement was not amended to provide a special allocation of the

gain from the Mall sale. As a result, petitioner is in a bind of his own making, bound by the general partnership profit allocation provisions of the Pecaris partnership agreement.[15]

Petitioners maintain that the general partnership allocation rules of section 704 do not apply to tax petitioner on a share of gain determined by reference to his stated percentage interest in the profits of Pecaris. Petitioners maintain that the distribution to petitioner of an undivided interest in the Mall contemporaneously with the cash distributions to Messrs. Boyas and Spillas, and their lack of any objection, amounted to a de facto amendment of the Pecaris partnership agreement. However, we have rejected that characterization, holding that petitioner did not receive a distribution from Pecaris of an interest in the Mall.

Section 761(c) requires that all partners agree to an amendment to the partnership agreement. At the time the transaction closed, petitioner's Pecaris partners were not aware of his interest as a Coastal partner in the other side of the transaction. Although Messrs. Boyas and Spillas may have become aware of petitioner's participation in Coastal prior to the

---

[15]In this connection, respondent's brief appropriately quoted:

For of all the sad words of tongue or pen,
The saddest are these: "It might have been!"

[John Greenleaf Whittier, Maud Muller, St. 53]

preparation and filing of the Pecaris partnership return, there is no evidence that they actually agreed to an amendment to the Pecaris partnership agreement. Petitioners' argument that there was a de facto amendment is belied by the way that Pecaris reported the transaction on its 1988 partnership return.[16]

Petitioners argue that the definitions of partnership agreement and amendment of the partnership agreement are much more expansive, for the purpose of determining distributive shares of gain under section 704(b), than they are under section 761. Compare sec. 1.761-1(c), Income Tax Regs., with sec. 1.704-1 (b)(2)(ii)(h), Income Tax Regs. The regulation under section 704(b) states:

> Partnership agreement defined. For purposes of this paragraph, the partnership agreement includes all agreements among the partners, or between one or more partners and the partnership, concerning affairs of the partnership and responsibilities of partners, whether oral or written, and whether or not embodied in a document referred to by the partners as the partnership agreement. * * * [Sec. 1.704-1(b)(2)(ii)(h), Income Tax Regs.]

Be that as it may, petitioners have not persuaded us that the construction they wish to put on the transaction was reflected in

_____

[16]Mr. Spillas testified that he learned of petitioner's participation in Coastal before the Pecaris return was prepared, and that he thought that petitioner had some contact with Pecaris' accountant regarding "some modification," but did not know for certain whether petitioner and the Pecaris return preparer discussed modifying the Pecaris agreement. Mr. Spillas testified that he instructed the Pecaris return preparer to do what was necessary for the partnership to effectuate a correct filing.

any actual agreement, oral or otherwise, among the Pecaris partners, or that the reduced distribution of cash to petitioner from the escrow amounted to a de facto amendment of the Pecaris partnership agreement. In the circumstances of this case, we do not indulge in any of the constructions that petitioners have asked us to adopt to determine that none of the Pecaris gain was allocable to petitioner.

While the characterization of tax items is determined at the partnership level, sec. 702(b), a partner must include his distributive share of partnership income in gross income whether or not he has received any distributions from the partnership, sec. 702(c). This is true even when the partner's right to receive distributions may be contingent or forfeitable, United States v. Basye, 410 U.S. 441 (1973), or the partnership's income has been concealed by another partner. Starr v. Commissioner, 267 F.2d 148 (7th Cir. 1959), affg. in part, revg. in part, and remanding T.C. Memo. 1958-50. Because the partnership serves as a conduit through which income is allocated to each partner in proportion to his partnership interest, the partner takes these amounts into income in his taxable year in which the partnership's taxable year ends. Secs. 702(a), 706(a).

Section 704(a) provides that a partner's distributive share of partnership income, gain, loss, or deduction is generally determined by the partnership agreement. According to the

Pecaris partnership agreement, petitioner had and continues to have a 25-percent profits and losses interest in the partnership. Thus, 25 percent of Pecaris' gain from its sale of its entire interest in the Mall must be allocated to petitioner under the partnership allocation rules, regardless of what was distributed to him in cash. United States v. Basye, supra at 453 ("it is axiomatic that each partner must pay taxes on his distributive share of the partnership's income without regard to whether that amount is actually distributed to him"); Curtis v. Commissioner, T.C. Memo. 1995-344 (few principles of partnership taxation are more firmly established than the notion that, no matter the reason for nondistribution, each partner must pay taxes on his distributive share).

Petitioners also argue that any allocation to petitioner of gain from the sale of the Mall would not have "substantial economic effect" under section 704(b) and the regulations thereunder. Petitioner's argument is premised on the conclusion we've already rejected, that the Mall transaction, insofar as petitioner is concerned, amounted to a distribution to him by Pecaris of an undivided interest in the Mall that he contributed to Coastal. The inclusion of the $700,000 credit in the amount realized by and recognized to Pecaris and distributed by Pecaris to petitioner, supports our conclusion that the allocation of a distributive share of the Pecaris gain to petitioner has

substantial economic effect, and that there is no meaningful discrepancy between the economic effect of and of the tax accounting for petitioner's participation as a partner of Pecaris.

We need not accept petitioners' invitation to engage in an extended substantial economic effect analysis of the Pecaris partnership agreement. We don't have here the usual situation that section 704(b) and the regulations thereunder are designed to deal with, in which the taxpayer is trying to justify a special allocation provided by the partnership agreement. Here we have a common garden variety partnership agreement with a straightforward conventional provision for sharing profits and losses that petitioners are asking us to disregard. The absence of any agreement among the Pecaris partners modifying the general profit and loss sharing provisions of the Pecaris partnership agreement precludes any special allocation of the gain from the sale of the Mall away from petitioner. See Deauville Operating Corp. v. Commissioner, T.C. Memo. 1985-11.

Petitioner presses the argument that the Pecaris partners' capital accounts were not kept in accordance with the section 704(b) regulations, sec. 1.704-1(b)(2)(ii)(b)(1), Income Tax Regs., that liquidating distributions were not required to be made in accordance with those regulations, sec. 1.704-1(b)(2)(ii)(b)(2), Income Tax Regs., and that there was no

deficit make-up provision in the Pecaris partnership agreement, sec. 1.704-1(b)(2)(ii)(b)(3), Income Tax Regs.  Even assuming for the sake of argument that allocating gain from the sale of the Mall to petitioner would lack substantial economic effect under the section 704(b) regulations, his distributive share of income should then be determined in accordance with his interest in the partnership.  Sec. 1.704-1(b)(3), Income Tax Regs.  Absent substantial economic effect, petitioner and the other Pecaris partners would still be allocated gain in accordance with their respective partnership interests under the partnership agreement.

Accordingly, we hold that petitioner's distributive share of Pecaris partnership gain is recognized to him on the Pecaris partnership sale of the Mall.  As a 25-percent partner of Pecaris, petitioner's distributive share of gain from the sale of the Mall is $827,968 (Pecaris gain of $3,311,873 x .25).

_____

Before we address the additions to tax, we briefly advert to three issues lurking in the record that are not in issue:  The $100,000 brokerage commission that was not the subject of an additional adjustment by respondent; petitioner's pretrial motion, which we denied, for leave to amend petition to take account of any reduction in petitioner's reported taxable income from Coastal that would result from the increased basis of the Mall buildings and tangible personal property in the hands of

Coastal attributable to taxing petitioner on a distributive share of Pecaris gain on the sale of the Mall; and the tax treatment of the value of the Mall in excess of $4.8 million, 90 percent of which was arguably appropriated by petitioner without the knowledge of his partners.

Petitioner received from Pecaris a cash distribution of $95,783 and total credits of $700,000, only $600,000 of which was attributable to his interest as a partner of Pecaris, and equatable with the cash distribution of $695,783 received by petitioner's equal partner in Pecaris, Mr. Spillas. The other $100,000 of credit was attributable to the brokerage commission in that amount that does not appear to have been paid, but which was used by Pecaris as an offset in computing its gain realized on the sale of the Mall. Although the record does not disclose whether it was HGM or petitioner who was actually entitled to receive the commission or the nature or extent of the ownership or employment relationship between petitioner and HGM, it's clear that petitioner received the benefit of the credit in the computation for partnership accounting purposes of his capital contribution to Coastal. Inasmuch as the right to receive the commission arose not from petitioner's status as a partner of Pecaris, see, e.g., Kobernat v. Commissioner, T.C. Memo. 1972-132, but as a real estate broker affiliated with HGM, see Williams v. Commissioner, 64 T.C. 1085, 1088-1089 (1975), section

707(a) would appear to apply to cause the credit received in exchange for services rendered to the partnership to be included in petitioner's gross income as compensation. Shotts v. Commissioner, T.C. Memo. 1990-641. Be that as it may, respondent neither made any such adjustment in the statutory notice nor moved to amend her answer to include it.

Petitioners filed a pretrial motion, which we denied, for leave to amend petition to compute the reduction in petitioner's taxable income from Coastal for 1988 that would result from the increased basis and depreciation of the Mall buildings and tangible personal property attributable to taxing petitioner on a distributive share of Pecaris gain on the sale of the Mall. The record of this case as tried lacks the facts with respect to the relative values and amounts of purchase price allocable to land and buildings and other depreciable property needed to make a Rule 155 computation giving effect to the basis adjustment.

Because Canada Life valued the Mall at $5.5 million, Coastal's purchase of the Mall for $4.8 million, including the $700,000 credit, arguably yielded a windfall to Coastal, with 90 percent of the benefit accruing to petitioner. Any excess value of the Mall that petitioner appropriated should also be added to petitioner's gross income, resulting in a deficiency in excess of the amount determined by respondent. Although the actual value of the Mall may well have exceeded $4.8 million, based upon the

amount that Canada Life was willing to lend on the security of the Mall, it would be sheer speculation for us to pick any value in excess of $4.8 million and use that figure to support charging petitioner with any additional income for tax purposes. Respondent has not moved to do so, and respondent would have had the burden of proving any alleged excess value if we had allowed an amendment to respondent's answer to that effect.  There having been no motion to amend the answer or argument to this effect by respondent, see sec. 6214(a), and in view of our uncertainty as to, and lack of evidence of, the actual amount of the excess, we have confined our analysis to the acknowledged fact that the Mall had a value no less than $4.8 million.  Cf. Law v. Commissioner, 84 T.C. 985, 989 (1984).

III. Additions

A.   Section 6653 Negligence Addition

Respondent determined that petitioners are liable for an addition to tax for negligence under section 6653(a)(1) for 1988. Section 6653(a)(1) provides that, if any part of any underpayment is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment.

Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the

circumstances.  <u>Rybak v. Commissioner</u>, 91 T.C. 524, 565 (1988); <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985).

We find that the underpayment was not due to negligence or disregard of rules or regulations.  Petitioner has limited knowledge concerning Federal income taxes, and relied primarily on professional tax advisers and his partner in Coastal, who is a certified public accountant charged with its financial management, in preparing his 1988 tax return and disclosing the transaction at issue.  Respondent relies on <u>Jaques v. Commissioner</u>, 935 F.2d 104 (6th Cir. 1991), affg. T.C. Memo. 1989-673, maintaining that petitioner failed to establish what information was given to his accountant.  In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure.  <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  We are satisfied that petitioners have met their burden of proof on each of these factors.

Petitioners attached Form 8082 to their tax return, disclosing petitioner's treatment of the transaction at issue as being different from the way in which Pecaris treated the transaction.  Although we disagree with the way in which the transaction was treated by petitioner for tax purposes, petitioners' Form 8082 disclosure convinces us that petitioner

sufficiently disclosed to his accountant his transactions with Pecaris, and that petitioners reasonably relied on the way in which their accountant treated the transaction on the joint return.

The characterization of the Mall transaction and partnership allocation rules present complex legal issues, on which there can be reasonable differences of opinion. See Yelencsics v. Commissioner, 74 T.C. 1513, 1533 (1980); cf. Marcello v. Commissioner, 43 T.C. 168, 182 (1964), affd. and remanded in part 380 F.2d 499 (5th Cir. 1967). Petitioner's beliefs that the credits should not be included in the amount realized by Pecaris or in the computation of its taxable gain and that there was a de facto amendment to the Pecaris partnership agreement that relieved him from the allocation of gain that we hold him accountable for, were not completely untenable. We reject respondent's imposition of the addition to tax for negligence.

B.  Section 6661 Substantial Understatement Addition

Respondent determined that petitioners are liable for the addition to tax for substantial understatement of income tax in 1988. Income tax is substantially understated if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6661(b)(1)(A). Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any

underpayment attributable to such understatement.  Pallottini v. Commissioner, 90 T.C. 498 (1988).  This amount may be reduced if the taxpayer shows that there was substantial authority for his treatment of an item, or that the relevant facts affecting the tax treatment of the item are adequately disclosed on the return or in a separate statement attached to the return.  Sec. 6661(b)(2)(B); secs. 1.6661-3, 1.6661-4, Income Tax Regs.

Petitioners disclosed on Form 8082 that petitioner was treating the disposition of the Mall in a manner inconsistent with the treatment by Pecaris and his Pecaris partners.  Although petitioners' Form 8082 did not apprise respondent of the exact nature of the controversy, petitioners' disclosure on their return for respondent flagged their omission from their 1988 gross income of $827,968--the amount of respondent's  adjustment. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987) (citing S. Rept. 97-494, at 274 (1982)).  We reject respondent's imposition of the section 6661 substantial understatement addition.

To reflect the foregoing,

Decision will be entered
for respondent with respect to
the determined deficiency and
for petitioners with respect to
the additions to tax.